IN THE DISTRICT COURT OF THE UNITED STATES FOR THE

MIDDLE DISTRICT OF ALABAMA, NORTHERN DIVISION

| | | |
|---|---|---|
| CENTRAL ALABAMA FAIR HOUSING CENTER, et al., | ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) ) | CIVIL ACTION NO. 2:11cv982-MHT (WO) |
| JULIE MAGEE, in her official capacity as Alabama Revenue Commissioner, and JIMMY STUBBS, in his official capacity as Elmore County Probate Judge, | ) ) ) ) ) ) ) ) ) | |
| Defendants. | ) ) | |

OPINION AND ORDER

Defendant Julie Magee, Revenue Commissioner for the

State of Alabama, has filed a motion  to dissolve the

temporary restraining order this court entered on

November 23, 2011. In that order, Central Alabama Fair

Housing Center v. Magee, 2011 WL 5878363 (M.D. Ala. Nov.

23, 2011), the court found that the plaintiffs were

likely to prevail on their claim that § 30 of the Beason-

Hammon Alabama Taxpayer and Citizen Protection Act, 2011

Ala. Laws 535 (HB 56), as applied to Alabama's manufactured-homes statute, 1975 Ala. Code § 40-12-255, is preempted by federal law. <u>Magee</u>, 2011 WL 5878363, at *2. Commissioner Magee's motion to dissolve will be denied.

### I.

As explained, § 30 of HB 56 makes it unlawful for "[a]n alien not lawfully present in the United States" to enter into, or attempt to enter into, "a business transaction with the state or a political subdivision of the state." HB 56 § 30 (Doc. No. 31-1, at 68). Under § 30(d) of HB 56, an individual who enters into or attempts to enter into such a transaction commits a Class C felony, <u>id</u>., and can be imprisoned up to ten years. 1975 Ala. Code 13A-5-6(a)(3). Meanwhile, in lieu of an ad valorem property tax, § 40-12-255 requires that owners of manufactured homes pay an annual registration fee to obtain an identification decal that must be visibly

displayed on the exterior of their manufactured home. 1975 Ala. Code § 40-12-255(a). The registration and fee are due October 1 of each year and considered delinquent if not paid by November 30, at which point a non-compliant owner of a manufactured home can be given a civil fine or face criminal charges for a Class C misdemeanor, punishable up to three months in jail. 1975 Ala. Code § 13A-5-7(a)(3). In addition, § 40-12-255 requires that the owner of a manufactured home obtain a permit "to move said manufactured home on the highways of Alabama," and a current registration is required to obtain the moving permit. 1975 Ala. Code § 40-12-255(j). As above, moving a manufactured home without a permit is subject to civil penalties and criminal prosecution as a Class C misdemeanor. Id.

Taken together, application of § 30 of HB 56 to § 40-12-255 puts in an intractable dilemma aliens who wish to keep their mobile homes but are unable to verify their lawful residency: they face civil and criminal liability

for not paying their manufactured home tax, while simultaneously facing civil and criminal liability if they attempt to remove their homes from the State. They can neither stay, nor can they go. In addition, even attempting to pay the registration fee without verification of lawful residence amounts to a felony.

Because States "enjoy no power with respect to the classification of aliens," Plyler v. Doe, 457 U.S. 202, 225 (1982), and the power to "regulate immigration is unquestionably exclusively a federal power," state laws that conflict with federal laws are invalid as preempted. DeCanas v. Bica, 424 U.S. 351, 354 (1976). In its prior order, the court concluded that defendant Magee's application of § 30 of HB 56 to § 40-12-255 was likely preempted because she was not, as required by HB 56 itself, using federal standards--through either the Systematic Alien Verification for Entitlements (SAVE) Program or by verification with the Department of Homeland Security (DHS) pursuant to 8 U.S.C.

4

§ 1373(c)--to verify immigration status.  Instead, Magee's practice involved the use of "state-created criteria" for determining immigration status, which is impermissible.  <u>See</u> <u>DeCanas</u>, 424 U.S. at 355; <u>League of United Latin Am. Citizens v. Wilson</u>, 908 F. Supp. 755, 770 (C.D. Cal. 1995) (Pfaelzer, J.).

In response, as expressed in a memorandum dated November 28, 2011, and sent to various unnamed county officials (probate judges, revenue commissioners, county tax collectors, and county licensing officers), Commissioner Magee has interpreted the court's ruling as concerning only "the process to be followed in determining an alien's lawful presence in the United States" and as inapplicable to "the process to be used in determining a person's United States Citizenship."  Magee Memo (Doc. No. 57-1, at 1).  Based on a distinction between determining <u>citizenship</u> and an <u>alien's lawful presence</u>, the Department of Revenue's policy now allows state and local officials encountering those who wish to

5

enter into a "business transaction" with that state agency to first ask whether the individual has a valid driver's license. If a person says "yes," state and local officials may use "the AL-Verify Program to confirm that ... applicant has a valid, unexpired Alabama driver's license or non-driver's identification card." Id. If a person says "no" but claims to be a United States citizen, then the officials may verify his citizenship through an enumerated list of documents. (The list, apparently, is derived from § 29(k) of HB 56, which § 30 incorporates by reference). The policy does not state what happens to a person who claims to be a citizen but does not have an acceptable document for verification; presumably the officials must refuse the "business transaction." However, if a person says "no" to having a driver's license and again says "no" to being a citizen but instead "states that he is a lawful alien (lawfully present in the United States), then the

person's status as a lawful alien should be verified through" SAVE or DHS.   <u>Id</u>. at 2.

As the new policy recognizes, registration for SAVE is not automatic.   <u>See</u> <u>id</u>.   Instead, as indicated by the U.S. Citizenship and Immigration Services (USCIS) website, use of SAVE requires each agency to apply for authorization by providing background information on the agency, which includes both the source of law "authorizing [the] agency to administer the benefit or license or engage in another activity for which [the] agency will be verifying immigration status" and an estimate of the "number of queries [the] agency will submit each year."   USCIS Website (Doc. No. 67-7, at 2). After that, an agency must await "legal review," which can take several weeks to complete.   <u>Id</u>. at 3.   The agency must then enter into a memorandum of agreement with USCIS that outlines the agency's financial obligations and the amount it will pay to use SAVE. Given this process, Commissioner Magee's policy

7

memorandum acknowledges that state and local officials
cannot begin using SAVE immediately.  Magee Memo (Doc.
No. 57-1, at 2-3).  At the same time, this memorandum
says nothing about how any state or local subdivision
will obtain DHS verification under 8 U.S.C. § 1373(c).

Regardless, where DHS does not verify the lawful
presence of an alien, the new policy recognizes that
Commissioner Magee's old standards, listed in § 12(d) of
HB 56, are "no longer valid" and that state or county
officials "can no longer allow an alien to document his
lawful presence in the United States through the use of
documents or legible photocopies of documents."  Magee
Memo (Doc. No. 57-1, at 2-3).  Instead, if state or local
officials are unable to verify an alien's lawful presence
through SAVE or verification with DHS, then the officials
"should allow the alien to conduct the requested business
transaction."  Id.

Commissioner Magee argues these policy changes, as
outlined in her memorandum, mean "the basis of the

temporary restraining order no longer exists" and that the order should therefore be dissolved.  Mo. to Dissolve (Doc. No. 57, at 2).[1]  The court cannot agree.


## II.

As an initial matter, Commissioner Magee has failed to point to any legal standard or Federal Rule of Civil Procedure under which the court should find her requested relief is warranted.  The plaintiffs argue that the court should use the standard for evaluating whether a preliminary injunction should be modified or dissolved, namely, whether the movant has made a showing that changed circumstances warrant discontinuation of the order, which "may be satisfied by showing either a significant change in factual conditions or law."  11A

---

1. The court reads Magee's motion to dissolve as applying to only whether the plaintiffs can demonstrate a substantial likelihood of success on the merits of their claim, not as challenging any of the other factors that are necessary to obtain temporary equitable relief. Accordingly, Magee's motion in no way questions the determination made in court's prior order regarding these factors, <u>Magee</u>, 2011 WL 5878363, at * 3.

Wright et al., Federal Practice and Procedure § 2961 (2d ed. 1995).   This standard echos the test described in Rufo v. Inmates of Suffolk County Jail, where the Supreme Court explained that a party seeking modification of a consent decree "bears the burden of establishing a significant change in circumstances warrants revision of the decree" and that this burden may be satisfied "by showing either a significant change in factual conditions or in law."  502 U.S. 367, 383-84 (1992).  If the moving party meets this standard, the court then considers "whether the proposed modification is suitably tailored to the changed circumstance."  Id. 391.

The Eleventh Circuit Court of Appeals has applied Rufo to the context of permanent injunctions, see Riccard v. Prudential Ins. Co., 307 F.3d 1277, 1298 (11th Cir. 2002), and other courts have relied on the same standard in the preliminary-injunction context as well.  E.g., Concilio de Salud Integral de Loiza, Inc. v. Perez-Perdomo, 551 F.3d 10, 16 (1st Cir. 2008); Sprint

10

<u>Communications   Co. v. CAT Communications Int'l, Inc.</u>,
335 F.3d 235, 242 (3d Cir. 2003).

Given this analogous treatment of requests to modify
or dissolve various forms of equitable relief and because
Commissioner Magee's argument is essentially one of
changed circumstances, this court employs the <u>Rufo</u>
analysis here.  Indeed, the rationale behind looking to
changed circumstances is especially applicable in this
case.  "The need for changed circumstances prevents an
enjoined party from constantly challenging the imposition
of a[n] ... injunction," <u>Sprint</u>, 335 F.3d at 242, and a
court should redraft or vacate its order only when doing
so is necessary "to insure that the decree accomplishes
its <u>intended result</u>."  Wright, <u>supra</u>, § 2961 (emphasis
added).

The intended result of the court's temporary
restraining order was to ensure that, statewide, § 30 of
HB 56 would in no way be applied to individuals seeking
to renew their manufactured-home decals under § 40-12-
255.  While the memorandum indicates that, under the new

policy, the impermissible "state-created criteria" identified in the prior order can no longer be used, nothing about that policy change, by itself and in the abstract, indicates that state and local officials have stopped engaging in conduct preempted by federal law. Put differently, nothing in the memorandum necessarily and conclusively demonstrates that there has been a change in the actual circumstances of how § 30 of HB 56 will be and has been applied.

In fact, and contrary to the new policy as expressed in the memorandum, the plaintiffs have introduced evidence indicating that, in practice, nothing on the ground has changed, and particularly at the county level: On November 28 and 29, 2011, the first two business days following the court's order, plaintiffs' counsel say that they received numerous calls from individuals who were not permitted to pay registration fees because they could not provide sufficient proof of their immigration status. See Tumlin Decl. (Doc. No. 67-4, at 2); Brooke Decl. (Doc. No. 67-1, at 2). These reports were from five

12

counties in the state. A woman in Gadsden (Etowah
County, Alabama), for example, was "told nothing had
changed" in light of the court's order, "and that she had
to produce a driver's license." Brooke Decl. (Doc. No.
67-1, at 2). Meanwhile, in Birmingham and Bessemer
(both in Jefferson County) two individuals were told,
respectively, that they needed a valid driver's license
and that they "needed to provide proof of lawful
immigration status" to register their manufactured homes.
Tumlin Decl. (Doc. No. 67-4, at 3). In similar fashion,
an employee of plaintiff Central Alabama Fair Housing
Center called the Houston County Probate office on
November 28, and was told that "a driver's license is
still required." Singh Decl. (Doc. No. 67-3, at 2).[2]

---

2. In addition, before the court is the plaintiffs'
motion, filed yesterday, to enforce the temporary
restraining order. This motion, as supported by
declarations, alleges that more individuals, including at
least one in a sixth county, have been denied the ability
to register their manufactured homes on the basis that
they failed to provide evidence of citizenship or lawful
residence. See id. at 5-7; Brooke Decl. (Doc. No. 70-1).

13

Additional record evidence, the plaintiffs argue, suggests that compliance has not been confirmed:  When the plaintiffs' attorneys notified Commissioner Magee's counsel that several individuals across five counties were still being denied the ability to register their manufactured homes because they could not demonstrate lawful immigration status, defense counsel replied that the new policy memorandum had been <u>sent</u> to these offices. Brooke Decl. (Doc. No. 67-1, at 3).  When asked about how the memorandum was sent and to whom it was sent and, most important, about whether there was any way to confirm that these offices were now in compliance, defense counsel failed to confirm.  Instead, he replied: "I am representing to you that the referenced offices ... have <u>received</u> Commissioner Magee's ... Memo.  If you would notify me of an office <u>unaware</u> of the Memo, I would appreciate it."  <u>Id</u>. at 6 (emphasis added).

The problem, of course, is that awareness is not compliance.   The  fact  that  Commissioner  Magee's memorandum expressed a new policy for enforcement of HB

14

56 does not necessarily reflect a change in practice. As the adage goes, a change in theory does not always mean a change in practice.  Confronted with the plaintiffs' evidence of alleged noncompliance, the court cannot conclude at this time on the current record, without a hearing, that circumstances have changed in a manner to warrant immediate dissolution of the temporary restraining order.[3]

_____

3.  The court makes no finding, at this time, that the plaintiffs' noncompliance allegation is true.  The denial of Commissioner Magee's motion for immediate dissolution is therefore without prejudice to her right to challenge the evidence submitted by the plaintiffs. To warrant immediate dissolution of a temporary restraining order, without a hearing, based on changes circumstances, a movant would have to come forward with undisputable evidence of full compliance in all material aspects or ask for a hearing on the disputed evidence, although, as indicated later in the instant opinion and order, Magee's motion is due to be denied on other grounds as well.

Indeed, with their motion to enforce, see supra note 2, the plaintiffs also contend that there is a change in circumstances but the change warrants additional injunctive relief.

15

III.

In any event, even assuming that there has been a change in practice as contemplated in Commissioner Magee's memorandum, the court is not convinced that this new policy achieves the intended result of the court's prior order. To be perfectly clear, the court intends that the defendants apply § 40-12-255 without any modification by HB 56 or reference to citizenship status; the question of citizenship or lawful immigration status is completely off-the-table. By its text, § 40-12-255 requires only that:

> "The owner of the manufactured home shall furnish to the registration official the make, model, year, length, width, number of transportable modules, and serial number of the manufactured homes and the registration official <u>shall</u> furnish a receipt to the manufactured home owner containing the above referenced information."

1975 Ala. Code. § 40-12-255(a) (emphasis added).

Even under the new policy, however, the State appears to burden manufactured home registration in ways not contemplated by § 40-12-255, which could, in practical

16

effect, deter individuals from attempting to register their manufactured homes.  As the memorandum concedes, there is no practical way any state agency could have registered for SAVE over the weekend, and the memorandum does nothing to address how verification from DHS works or how it can be obtained.  Therefore, if an alien lacks documentation and the agency cannot lawfully verify his citizenship status, then, under the Commissioner's proposed procedures, that alien will have gone through a three-step process related to immigration status all for naught, for regardless of the outcome of this questioning he must be given the registration papers.  The purpose of the court's prior order was not to empower state and local officials to erect a hurdle of ultimately inconsequential questioning and possible harassment for those attempting to reside in their manufactured homes without violating § 40-12-255.

The fact that the new policy still allows state and local government units to announce that immigration status will be verified by either SAVE or § 1373(c), but

17

acknowledges that this verification will not actually occur is akin to a fraud.  On one hand, state and local actors make public--for example, through probate office websites--their intention to condition manufactured home registration upon verification of an alien's lawful residence, but, on the other hand, simultaneously and quietly recognize that such verification, and the denial of a manufactured home registration, cannot actually occur.  <u>Cf</u>. Singh Decl. (Doc. No. 67-3, at 5) (depicting county website indicating that "proof of U.S. Citizenship is required when renewing all manufactured homes"); Crook Decl. (Do. No. 67-2, at 5,9) (same).  Importantly, the ultimately hollow requirement of verification is not insubstantial: it comes backed, as per the text of HB 56, with the threat of felony criminal sanction should anyone dare to attempt to register their manufactured home knowing they lack verification.  Just as a wooden owl perched atop the bridge of a fishing boat wards off seagulls with its menacing but ultimately harmless glare, the Commissioner's new policy appears designed to keep

18

undocumented immigrants from even attempting to register their mobile homes, even though their immigration status can have no bearing on that transaction.  In short, the court is not convinced that the new policy outlined in Commissioner Magee's memorandum would not achieve indirectly what the court's order directly prohibits.

### IV.

Even without the foregoing, the court remains convinced that dissolving the temporary restraining order would be inappropriate.  As noted in the prior order, the plaintiffs have presented several reasons why § 30 of HB 56 as applied to § 40-12-255 should be enjoined.  Indeed, they have presented several independent grounds for finding preemption as well, none of which turn upon whether "state-created criteria" are being used to enforce § 30 of HB 56.

The court finds that the plaintiffs are substantially likely to prevail on their claim that § 30 of HB 56 is preempted as applied to Alabama's manufactured homes

19

statute.  State law is "naturally preempted to the extent of any conflict with a federal statute," <u>Crosby v. Nat'l Foreign Trade Council</u>, 530 U.S. 363, 372 (2000), which can occur when a state law frustrates "the accomplishment of a federal objective." <u>Geier v. Am. Honda Motor Co.</u>, 529 U.S. 861, 873 (2000).  Here, that federal "objective" is found in the Immigration and Nationalization Act (INA), 8 U.S.C. § 1101 et seq., a "comprehensive federal statutory scheme for regulation of immigration and naturalization" that sets "the terms and conditions of admission to the country and subsequent treatment of aliens lawfully in the country." <u>Chamber of Commerce v. Whiting</u>, 131 S. Ct. 1968, 1973 (2011) (internal quotes omitted).

The INA establishes a number of classifications for aliens who have entered the United States (for example, visitors and other non-immigrants, immigrants who plan on staying permanently, or those seeking refugee or asylum) and each classification has its own set of statutory requirements for determining the length, conditions, and

20

terms of an alien's stay. At the heart of this scheme is enforcement, which rests squarely within the discretion of the executive branch of the federal government, and often times the Attorney General. See, e.g., 8 U.S.C. § 1229b(a) (empowering the Attorney General to withhold removal); 8 U.S.C. § 1229b(b)(2) (providing discretion to withhold removal for victims of domestic abuse). But, even with this discretion, the federal determination about whether aliens must be deported or the conditions under which they may remain is incomplete; the executive must provide a hearing before an immigration law judge to remove a person from the United States or when it seeks to determine whether an individual deserves some other form of relief. See, e.g., 8 U.S.C. § 1254a (barring deportation of those with "temporary protected status"); 8 U.S.C. § 1255(a) (setting standards for adjustment of status to permanent residency). In fact, the INA permits, and due process may require, judicial review of deportation decisions. 8 U.S.C. § 1229a; Alhuay v. U.S. Atty Gen., ___ F.3d___, 2011 WL 5061386, at *10 (11th

Cir. Oct. 26, 2011).  Thus, given the INA, the executive
has wide latitude to allow aliens to remain in the
country as a matter of discretion, and may be prevented
from deporting certain individuals all-together.

Applied to § 40-12-255, § 30 of HB 56 stands as an
obstacle to the INA's balance of discretion and process
by making it difficult for those who have been permitted
to remain in the country to live in their homes.  While
Congress has created a number of statutes sanctioning
various forms of unlawful <u>entry</u> into the United States,
<u>see, e.g.</u>, 8 U.S.C. §§ 1323-28, and for the "harboring"
of an alien, 8 U.S.C. § 1324, Congress never criminalized
an alien's attempt to lawfully reside in his home; nor
has Congress permitted States to regulate the residence
of aliens.  Instead, enforcement is left to the
executive.  Any state law, like HB56, that "imposes
additional criminal laws on top of a comprehensive
federal scheme that includes no ... carve out for state
regulation" is likely preempted.  <u>Ga. Latino Alliance for</u>

Human Rights v. Deal, 2011 WL 2520752, at *14 (N.D. Ga. June 27, 2011) (Thrash, J.).

In fact, every court that has considered a locality's attempt to regulate immigration by limiting access to housing for individuals who cannot prove citizenship or lawful residence has been enjoined as preempted.  See, e.g., Lozano v. City of Hazleton, 620 F.3d 170 (3d Cir. 2010), vacated and remanded on other grounds, 131 S. Ct. 2958 (2011); Villas at Parkside Partners v. City of Farmers Branch, 701 F. Supp. 2d 835 (N.D. Tex. 2010) (Boyle, J.); Garrett v. City of Escondido, 465 F. Supp. 2d 1043 (S.D. Cal. 2006) (Houston, J.).

Perhaps most convincingly, the other provisions of HB 56 that, on their face, apply to housing were enjoined as likely preempted in United States v. Alabama, 2011 WL 4469941, at *41-45 (Sept. 28, 2011) (Blackburn, C.J.). There, it was clear that § 13 of HB 56--which prohibits anyone from entering into rental agreements with aliens without verifying their lawful residence--applied to the housing context, but the court did not believe, and

23

expressly declined to find, that § 30 had the broad reach it has been given.  Id. at 59-60 & n.25.  It is now clear that § 30 of HB 56 reaches § 40-12-255 and thereby conditions lawful residence in a manufactured home upon verification of immigration status.  In light of this consistent body of precedent, the court finds that the plaintiffs are substantially likely to prevail on their preemption claim.

***

Accordingly, it is ORDERED that defendant Julie Magee's motion to dissolve the temporary restraining order (Doc. No. 57) is denied.

DONE, this the 1st day of December, 2011.

    /s/ Myron H. Thompson    
UNITED STATES DISTRICT JUDGE