IN THE DISTRICT COURT OF THE UNITED STATES FOR THE

MIDDLE DISTRICT OF ALABAMA, NORTHERN DIVISION

```
CENTRAL ALABAMA FAIR        )
HOUSING CENTER, et al.,      )
                            )
     Plaintiffs,             )
                            )       CIVIL ACTION NO.
     v.                      )        2:11cv982-MHT
                            )           (WO)
JULIE MAGEE, in her          )
official capacity as         )
Alabama Revenue              )
Commissioner, and            )
JIMMY STUBBS, in his         )
official capacity as         )
Elmore County Probate        )
Judge,                       )
                            )
     Defendants.             )
```

OPINION

This lawsuit is a challenge to the application of

§ 30 of the Beason-Hammon Alabama Taxpayer and Citizen

Protection Act (commonly referred to as "HB 56"), 2011

Ala. Laws 535, which, when combined with another Alabama

statute, essentially prohibits individuals who cannot

prove their citizenship status from staying in their

manufactured homes.  The plaintiffs are the Central

Alabama Fair Housing Center, the Fair Housing Center of

Northern Alabama, the Center for Fair Housing, Inc., and two individuals proceeding under pseudonym as John Doe #1 and John Doe #2. The defendants are Julie Magee, in her official capacity as Alabama Revenue Commissioner, and Jimmy Stubbs, in his official capacity as Elmore County Probate Judge. The plaintiffs claim, among other things, that this application of HB 56 violates the Supremacy Clause of the United States Constitution (as enforced through 42 U.S.C. § 1983) and the Fair Housing Act ("FHA"), 42 U.S.C. § 3604. The jurisdiction of the court has been invoked pursuant to 28 U.S.C. §§ 1331 and 1343.

This as-applied challenge to HB 56 is now before the court on the plaintiffs' motion for a preliminary injunction. As explained below, the motion will be granted.

# I. BACKGROUND

## A.  Passage of HB 56

In June 2011, the Alabama legislature passed a comprehensive and far-reaching state immigration law: HB 56.  For example: § 7 prohibits an "alien who is not lawfully present in the United States" from receiving any state or local public benefits; § 8 makes it unlawful for an alien not lawfully present to enroll in or attend any public college; § 10 makes it a crime to fail to "complete or carry an alien registration document"; § 11 makes it "unlawful for an unauthorized alien to knowingly apply for work, solicit work in a public or private place, or perform work as an employee or independent contractor"; § 12 requires officers who have "reasonable suspicion ... that the person is an alien who is unlawfully present" to make a "reasonable attempt" to determine the citizenship and immigration status of the person; § 13 makes it unlawful to conceal, "harbor," or shield an "alien from detection," which includes

3

"entering into a rental agreement ... with an alien to provide accommodations[] if the person knows or recklessly disregards the fact that the alien is unlawfully present in the United States"; § 17 makes it a "discriminatory practice for a business entity or employer to fail to hire a job applicant who is a United States citizen or an alien who is authorized to work in the United States ... while retaining or hiring an employee who the business entity or employer knows, or reasonably should have known, is an unauthorized alien"; § 18 requires police officers to determine the citizenship of drivers pulled over and cited for driving without a valid license; § 27 voids certain contracts between "a party and an alien unlawfully present"; § 28 requires public schools to determine the citizenship and immigration status of their students; § 29 requires evidence of citizenship or lawful residence for voter registration; and § 30 prohibits "business transactions" between an "alien not lawfully present" and the State or

4

a political subdivision.   HB 56 (Doc. No. 31-1),
available electronically at Ala. Code § 31-13-29 (West
2011).

In sum, as Representative Micky Ray Hammon put it:
"This [bill] attacks every aspect of an illegal
immigrant's life.  They will not stay in Alabama. ...
[T]his bill is designed to make it difficult for them to
live here so they will deport themselves."  Leg. Session
(Doc. No. 14-3, at 27).[1]

---

1.  The Alabama legislature does not preserve or
produce official transcripts of their proceedings,
committee reports, or other legislative history.  See Ex
Parte Alfa Mut. Gen. Ins. Co., 742 So.2d 182, 187 (Ala.
1999)("Of course, Alabama has no record of proceedings
comparable to the Congressional Record as a source of
legislative history."); Macon v. Huntsville Utils., 613
So.2d 318, 320 (Ala. 1992).  The legislature does,
however, record its hearings, which are available online.
The plaintiffs have transcribed some of the legislative
debate and introduced the transcripts into evidence.  The
defendants have had the opportunity to view these
transcripts to verify authenticity, accuracy, and
breadth, and were to submit any objections with their
proposed findings of fact, but have not challenged or
supplemented any of the transcripts.  The court,
therefore, finds the transcripts both admissible and
reliable.

## B. Challenge to § 30 of HB 56

On November 18, 2011, after observing how the State was applying HB 56, the plaintiffs filed this lawsuit. Though the statute has many provisions, this litigation focuses exclusively on § 30 as applied to Alabama's manufactured homes statue, Ala. Code § 40-12-255.

Section 30 of HB 56 makes it unlawful for "[a]n alien not lawfully present in the United States" to enter into, or attempt to enter into, "a business transaction with the state or a political subdivision of the state." HB 56 § 30 (Doc. No. 31-1) at 68.[2]   Under § 30(d) of

---

2. In its entirety, § 30 provides:

"(a) For the purposes of this section, business transaction includes any transaction between a person and the state or a political subdivision of the state, including, but not limited to, applying for or renewing a motor vehicle license plate, applying for or renewing a driver's license or nondriver identification card, or applying for or renewing a business license. Business transaction does not include applying for a marriage license.

(continued...)

6

_____

2.(...continued)

"(b) An alien not lawfully present in the United States shall not enter into or attempt to enter into a business transaction with the state or a political subdivision of the state and no person shall enter into a business transaction or attempt to enter into a business transaction on behalf of an alien not lawfully present in the United States.

"(c) Any person entering into a business transaction or attempting to enter into a business transaction with this state or a political subdivision of this state shall be required to demonstrate his or her United States citizenship, or if he or she is an alien, his or her lawful presence in the United States to the person conducting the business transaction on behalf of this state or a political subdivision of this state. United States citizenship shall be demonstrated by presentation of one of the documents listed in subsection (k) of Section 31-13-29. An alien's lawful presence in the United States shall be demonstrated by this state's or a political subdivision of this state's verification of the alien's lawful presence through the Systematic Alien Verification for Entitlements program operated by the Department of Homeland Security, or by other verification with the Department of Homeland Security

(continued...)

HB 56, an individual who enters into or attempts to enter into such a transaction commits a Class C felony, id., and can be imprisoned up to ten years.   1975 Ala. Code 13A-5-6(a)(3).

─────────────────────

2.(...continued)
   pursuant to 8 U.S.C. § 1373(c).

   "(d) A violation of this section is a Class C felony.

   "(e) An agency of this state or a county, city, town, or other political subdivision of this state may not consider race, color, or national origin in the enforcement of this section except to the extent permitted by the United States Constitution or the Constitution of Alabama of 1901.

   "(f) In the enforcement of this section, an alien's immigration status shall be determined by verification of the alien's immigration status with the federal government pursuant to 8 U.S.C. § 1373(c). An official of this state or political subdivision of this state shall not attempt to independently make a final determination of whether an alien is lawfully present in the United States."

HB 56 § 30 (Doc. No. 31-1) at 68-69.

Meanwhile, in lieu of an ad valorem property tax, § 40-12-255 requires certain owners of manufactured homes pay an annual registration fee to obtain an identification decal that must be visibly displayed on the exterior of their manufactured home.  1975 Ala. Code § 40-12-255(a).[3]

---

3. Subparts (a) and (b) of § 40-12-255 provide:

"(a) Every person, firm, or corporation who owns, maintains or keeps in this state a manufactured home as defined according to subsection (n) of this section, ... shall pay an annual registration fee . . .; and upon payment thereof such owner shall be furnished an identification decal, designed by the Department of Revenue and color coded to denote the size and year issued, which shall be immediately attached to and at all times thereafter displayed at eye level on the outside finish of the manufactured home for which the registration fee was paid, and one foot from the corner on the right side facing the street, so as to be clearly visible from the street.  The fee shall be due and payable on October 1 of each year and delinquent if not paid before December 1 of each year."

"(b) The owner of any manufactured home
(continued...)

9

---

3.(...continued)
who fails to pay the registration fee
hereby provided for shall be subject to
a delinquent fee of $ 10 if payment is
made on or after December 1, or if the
manufactured home owner fails to pay the
registration fee or if the owner fails
to display the identification decal on
such manufactured home, as hereinabove
required.  Furthermore, the owner shall
be subject to a citation fee of $ 15 and
if the registration fee and citation fee
are not paid within 15 calendar days of
date cited a penalty of $ 24 will be
assessed  against  the  owner  of  the
manufactured  home.  ...  The  official
responsible   for   administering   the
provisions of this section must collect
all  fees  and  penalties  due  before  a
decal may be issued to the manufactured
home owner."

1975 Ala. Code. § 40-12-255.

The decal and registration requirements do not apply
to every owner of a manufactured home.  Instead, "the
registration fee shall be in lieu of the ad valorem taxes
that would have been available" for the manufactured home
beginning October 1, 1991.  Id.  Another section of
Alabama law provides that some manufactured home owners
still pay the ad valorem taxes directly instead of
through  the  registration  and  decal  process:  "All
manufactured  homes  located  on  land  owned  by  the
manufactured home owners, except those manufactured homes
rented or leased for business purposes, other than those
manufactured homes in the inventory of a manufactured
(continued...)

10

The registration and fee are due October 1 of each year and considered delinquent if not paid by November 30, at which point a noncompliant owner of a manufactured home can be given a civil fine or face criminal charges for a Class C misdemeanor, id. § (l), punishable up to three months in jail. 1975 Ala. Code § 13A-5-7(a)(3). In addition, § 40-12-255 requires that the owner of a manufactured home obtain a permit "to move said manufactured home on the highways of Alabama," and a current registration is required to obtain the moving permit. 1975 Ala. Code § 40-12-255(j).[4]   As above,

_____

3.(...continued)
home dealer or manufacturer." 1975 Ala. Code § 40-11-1. In practical terms, this means that individuals who live in manufactured home parks have to go through § 40-12-255 to pay their version of an annual property tax, while those who have a manufactured home on their own property are still assessed a traditional ad valorem tax.

4. Subsection (j) of § 40-12-255 provides in part as follows:

> "(j) No manufactured home may be moved on the roads or highways of Alabama
> (continued...)

11

_____

4.(...continued)

unless one of the following provisions are met:

(1) Every person, firm, or corporation who owns, maintains, or keeps in this state a manufactured home, must obtain a permit to move said manufactured home on the highways of Alabama.  The permit shall be obtained from the county official who administers the manufactured home registration laws. Proof of payment of the current registration fee, issuance fee, and any applicable penalties shall be required before the moving permit shall be issued.  Manufactured home dealers shall not be required to obtain a moving permit when moving a manufactured home that is part of dealer's inventory or moving a manufactured home for the first time after a sale of such manufactured home from dealer's inventory as evidenced by a bill of sale or bill of lading.

. . .

(4) The provisions of this section shall be enforced by any law enforcement officials in the State of Alabama.  Any person, firm, or corporation moving a manufactured home on the roads or highways of Alabama without a moving permit shall be issued a traffic

(continued...)

moving a manufactured home without a permit is subject to civil penalties and criminal prosecution as a Class C misdemeanor. Id.

Defendant Magee is the Revenue Commissioner for the State and oversees the collection of taxes, including the registration fees for manufactured homes. See 1975 Ala. 40-2-11. Manufactured homes are registered through county offices, such as a revenue commissioner's office or a probate office. Defendant Stubbs is the Elmore County Probate Judge and oversees manufactured-home registration in Elmore County. Since HB 56 went into

---

4.(...continued)
citation for failure to have in possession the required moving permit and shall be guilty of a Class C misdemeanor; and upon conviction thereof shall be subject to a fine of not less than $ 50.

(5) The issuing official shall charge a $ 10 fee for the above referenced moving permit. One-half of said fee shall accrue to the county general fund to cover the costs of obtaining and issuing said permits, and the remaining one-half shall accrue to the State Road and Bridge Fund."

13

effect, Commissioner Magee has placed information about it on the Department of Revenue's website and provided county officials, such as Judge Stubbs, with training and instruction regarding HB 56 generally and § 30 more specifically.

The phrase "business transaction," as defined by § 30 in HB 56, appears to be unique in Alabama law and has not previously been used in this manner. Accordingly, there has been considerable debate as to whether a "business transaction" includes any undertaking that involves financial resources going to a state or local official, no matter how mundane. Since this litigation began, the Alabama Attorney General has provided some guidance about the outer limits of the scope of "business transactions" under § 30. See Luther Strange, Guidance Letter from Ala. Atty. Gen., No. 2011-02 (Dec. 2, 2011) (Doc. No. 79-4). Regardless of the outer limits of this term and even with the new guidance letter, it is undisputed that the State's interpretation of § 30 includes the transactions at issue here: the payment of registration fees and other

14

requirements associated with § 40-12-255. Thus, Commissioner Magee's office understands § 30 of HB 56 to apply to § 40-12-255, the Alabama manufactured homes statute, which means, among other things, that individuals who cannot verify their citizenship or lawful residency are precluded from registering their manufactured homes.

Taken together, therefore, the court finds that the application of § 30 of HB 56 to § 40-12-255 puts aliens who are unable to verify their lawful residency between a rock and a hard place: they face civil and criminal liability for not paying their manufactured home tax, while simultaneously facing civil and criminal liability if they attempt to remove their homes from the State. They can neither stay, nor can they go. In addition, even attempting to pay the registration fee without verification of lawful residence amounts to a felony. This is not mere speculation. As Magee admits, and the court finds as a matter of fact, when § 30 of HB 56 is applied § 40-12-255, "the individual Plaintiffs cannot

15

continue living in Alabama in manufactured homes they own and maintain on certain property without violating either Section 30 or Ala. Code § 40-12-255 or causing others to violate Section 30." Def. Magee Proposed Facts (Doc. No. 64, at 8).

### C.   Temporary Restraint of § 30

Following a hearing on November 23, 2011, the court issued a temporary restraining order enjoining enforcement of § 30 as applied to § 40-12-255, with the order to expire on December 7, 2011. <u>Cent. Ala. Fair Hous. Ctr. v. Magee</u>, 2011 WL 5878363 (M.D. Ala. Nov. 23, 2011). Commissioner Magee later filed a motion to dissolve the temporary restraining order, which the court denied on December 1. <u>Cent. Ala. Fair Hous. Ctr. v. Magee</u>, 2011 WL 6010501 (M.D. Ala. Dec. 1, 2011). Also, on December 1, Commissioner Magee agreed to extend the December 1 § 40-12-255 registration deadline to December 31. On December 7, the court extended the temporary

restraining order to December 12, 2011.  <u>Cent. Ala. Fair</u>

<u>Hous. Ctr. v. Magee</u>, 2011 WL (M.D. Ala. Dec. 7, 2011).


### D. Prior Challenges to HB 56

Admittedly, HB 56 was challenged in prior federal

litigation by a number of private parties: individual

plaintiffs, religious leaders, and several advocacy

groups, including the Hispanic Interest Coalition of

Alabama, the National Immigration Law Center, the Mexican

American Legal Defense and Educational Fund, and the

American Civil Liberties Union.  <u>Hispanic Interest Coal.</u>

<u>of Ala. v. Bentley</u>, 5:11-cv-2484 (N.D. Ala, July, 1,

2011); <u>Parsley v. Bentley</u>, 5:11-cv-2736 (N.D. Ala. Aug.

1, 2011).   The United States also challenged HB 56.

<u>United States v. Alabama</u>, 2:11-cv-2746 (N.D. Ala. Aug. 1,

2011).

In different ways, the prior litigation claimed that

HB 56, in its entirety and in specific provisions, was

unlawful on its face, that is, without implementation.

In that litigation, which was filed in the Northern

17

District of Alabama, the court temporarily enjoined all
of HB 56 until September 28, 2011, at which time it
declined to enjoin the entire Act preliminarily, but
found a number of individual sections likely unlawful.
Hispanic Interest Coal. of Ala. v. Bentley, 2011 WL
5516953 (Sept. 28, 2011) (Blackburn, J.); United States
v. Alabama, 2011 WL 4469941 (Sept. 28, 2011) (Blackburn,
J.).   The court held that § 30 of HB 56 should not be
enjoined.   United States v. Alabama, 2011 WL 4469941, at
* 59-60.   Both the private parties and the United States
sought a stay of enforcement pending the outcome of their
appeal for the non-enjoined sections of HB 56.    The
Eleventh Circuit Court of Appeals granted in part and
denied in part the stay.   United States v. Alabama, 2011
WL 4863957, at *6 (11th Cir. Oct. 14, 2011).   Relevant
here, the appellate court declined to grant a stay
pending appeal for the facial challenge to § 30 of HB 56.
Id.

In the prior litigation, the State claimed that the
United  States  was  "misinterpreting,  or  at  least

exaggerating, Section 30" and that there was no reason "why covered 'business transactions' would include the payment of property taxes or the payment of court fees." Alabama Br. (Doc. No. 33-5, at 37). Accordingly, that court interpreted § 30 narrowly and found that it prohibited only "transactions" involving the issuances of a number of licenses, including licenses to drivers, business, professionals, hospitals, and to day care facilities. United States v. Alabama, 2011 WL 4469941, at *60. The court expressly found that "the term 'business transactions' does not reach registration requirements," and therefore that it had "no need to decide whether prohibiting unlawfully-present aliens from ... complying with state and local government registration laws is prohibited." Id. at *59 n.25.

As the case before this court has revealed, the United States was not exaggerating in the prior litigation. Section 30 has now been applied broadly to prohibit manufactured home registration, which is, essentially, the property tax for certain manufactured

19

homes in Alabama.  <u>See</u> 1975 Ala. Code § 40-12-255(a).  In this light, § 30's application here is well beyond anything contemplated in the facial challenge in the prior litigation.

Therefore, as compared to the prior litigation, this case has a very narrow focus.  Whereas the first round of litigation challenged HB 56 <u>on its face</u>, this case involves only a very specific <u>application</u> of HB 56.  In the prior litigation, the posture of the case as a facial challenge meant that the court had to rely upon the text of the statute and the representations by the State to determine the breadth of § 30--no specific facts or parties subject to enforcement of the law were before the court.  As such, that court looked to the "common understanding" of the word "business" to determine how it might modify the term "transaction."  Unfortunately, as that court found, "the words of Section 30 obfuscate its meaning" because the section "declares a ban on business transactions and then proceeds to define 'business transactions' with examples, none of which fit within the

commonly understood definition of a business transaction." <u>United States v. Alabama</u>, 2011 WL 4469941, at *59. Section 30 lists as examples of a "business transaction" an application for or renewal of a vehicle license plate, driver's license, or business license.

Therefore, the challenge to the application of § 30 to § 40-12-255 presented here was not presented in the prior litigation.

## II.   DISCUSSION

### A. Preliminary-Injunction Standard

A preliminary injunction lasts through the pendency of the litigation to preserve the status quo until a meaningful decision on the merits is rendered. <u>United States v. Lambert</u>, 695 F.2d 536, 539-40 (11th Cir. 1983). To obtain this relief, the plaintiffs must demonstrate: (1) a substantial likelihood of success on the merits of their underlying case, (2) that they will suffer irreparable harm in the absence of an injunction, (3) that the balance of the harms suffered by the plaintiffs

without an injunction would exceed the harms suffered by the defendants, and (4) that an injunction would not disserve the public interest.  <u>Grizzle v. Kemp</u>, 634 F.3d 1314, 1320 (11th Cir. 2011).  In balancing these factors, while the likelihood of success is generally most important, the court may employ a "sliding scale" by "balancing the hardships associated with the issuance or denial" of the injunction against "the degree of likelihood of success on the merits"; the greater the potential harm, the lower the likelihood of success needs to be.  <u>Fla. Med. Ass'n v. U.S. Dep't of Health, Educ. & Welf.</u>, 601 F.2d 199, 203 n.2 (5th Cir. 1979).[5] Accordingly, where the "'balance of equities weighs heavily in favor of granting the injunction, the movant[s] need only show a substantial case on the merits.'"  <u>Gonzalez ex rel. Gonzalez v. Reno</u>, 2000 WL

---

5. In <u>Bonner v. City of Prichard</u>, 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc), the Eleventh Circuit Court of Appeals adopted as binding precedent all of the decisions of the former Fifth Circuit handed down prior to the close of business on September 30, 1981.

381901, at *1 (11th Cir. Apr. 19, 2000) (quoting <u>Ruiz v.</u>
<u>Estelle</u>, 650 F.2d 555, 565 (5th Cir. June 26, 1981)).

A "preliminary injunction is an extraordinary and drastic remedy not to be granted unless the movant clearly established the 'burden of persuasion' as to each of the four prerequisites." <u>Siegel v. LePore</u>, 234 F.3d 1163, 1176 (11th Cir. 2000) (en banc) (per curiam). That said, whether to issue a preliminary injunction lies within the sound discretion of the district court. <u>Solantic, LLC v. City of Neptune Beach</u>, 410 F.3d 1250, 1254 (11th Cir. 2005).

## B. Likelihood of Success on the Merits

### 1. Preemption

The United States Constitution makes federal law the "supreme Law of the Land." U.S. Const. art. VI, cl.2. For this reason, a "fundamental principle of the Constitution is that Congress has the power to preempt state law." <u>Crosby v. Nat'l Foreign Trade Council</u>, 530 U.S. 363, 372 (2000). In the immigration context, there

23

are three ways in which a state or local law may be
preempted by federal law: "(1) where the local law
attempts to regulate immigration" (a form of "express"
preemption); (2) where implementation of the local law is
an obstacle to or conflicts in any manner with any
federal laws or treaties ("conflict" preemption); and (3)
"where the local law attempts to operate in an area
occupied by federal law" ("field" preemption).  <u>Garrett
v. City of Escondido</u>, 465 F. Supp. 2d 1043, 1055 (S.D.
Cal. 2006) (Houston, J.) (internal quotation marks
omitted); <u>see also</u> <u>League of United Latin Am. Citizens v.
Wilson</u>, 997 F. Supp. 1244, 1253 (C.D. Cal. 1997)
(Pfaelzer, J.).  If preemption is found, the Supremacy
Clause invalidates the state or local law.  <u>Gade v. Nat'l
Solid Wastes Mgmt. Ass'n</u>, 505 U.S. 88, 108 (1992); <u>Denson
v. United States</u>, 574 F.3d 1318, 1345 (11th Cir. 2009).[6]

_____

        6.  When Congress legislates in a field the States
have traditionally occupied, there is a "presumption
against preemption," <u>Wyeth v. Levine</u>, 555 U.S. 555, 565
n.3 (2009); <u>see also</u> <u>Rice v. Santa Fe Elevator Corp.</u>, 331
U.S. 218, 230 (1947).  As applied to § 40-12-255's
                                              (continued...)

The plaintiffs are substantially likely to prevail on their preemption claim. Indeed, every court that has considered a state or local law that conditioned housing on the ability to prove lawful immigration status has held (or, in the context of preliminary-injunctive relief, found it substantially likely) that those laws are preempted. See Lozano v. City of Hazleton, 620 F.3d 170 (3d Cir. 2010), vacated, 131 S. Ct. 2958 (2011);[7]

---

6.(...continued)
manufactured home registration requirements, § 30 of HB 56 dictates how aliens must prove their lawful residence and whether aliens that lack documentation may lawfully live in a manufactured home. Because the verification of lawful immigration status and setting residency requirements for aliens are areas where the federal government, not the States, has traditionally held the reins, see, e.g., Fiallo v. Bell, 430 U.S. 787, 792 (1977), the court does not apply the presumption against preemption. Cf. United States v. Arizona, 641 F.3d 339, 348 (9th Cir. 2011) ("The states have not traditionally occupied the field of identifying immigration violations so we apply no presumption against preemption.").

7. The Supreme Court vacated and remanded Lozano for reconsideration in light of Chamber of Commerce v. Whiting, 131 S. Ct. 1968 (2011), which addressed an Arizona immigration statute providing for the suspension or revocation of "licenses of state employers that (continued...)

<u>United States v. Alabama</u>, 2011 WL 4469941 (N.D. Ala. 2011) (Blackburn, J.); <u>Villas at Parkside Partners v. City of Farmers Branch</u>, 701 F. Supp. 2d 835 (N.D. Tex. 2010) (Boyle, J.) ("Farmers Branch II"); <u>Villas at Parkside Partners v. City of Farmers Branch</u>, 577 F. Supp. 2d 858 (N.D. Tex. 2008) (Lindsay, J.) ("Farmers Branch I"); <u>Lozano v. City of Hazleton</u>, 496 F. Supp. 2d 477(M.D. Pa. 2007) (Munley, J.); <u>Garrett</u>, 465 F. Supp. 2d at 1056-57.

### a.  Federal Immigration Law

Enacted in 1952, the Immigration and Nationality Act (INA), 8 U.S.C. § 1101 <u>et seq.</u>, established "'a comprehensive federal statutory scheme for regulation of

_____

7.(...continued)
knowingly or intentionally employ unauthorized aliens."
<u>Id</u>. at 1973. The <u>Whiting</u> Court focused on the "interaction of federal immigration and state laws dealing with the <u>employment</u> of unauthorized aliens." <u>Id</u>. at 1974 (emphasis added). <u>Whiting</u> is silent on housing issues. Given that the Third Circuit expressly distinguished state regulation of employment from state regulation of housing, <u>Lozano</u>, 620 F.3d at 219-20, <u>Whiting</u> is not to the contrary. In other words, this court still finds <u>Lozano</u> persuasive.

immigration and naturalization' and set 'the terms and
conditions of admission to the country and subsequent
treatment of aliens lawfully in the country.'" Chamber
of Commerce v. Whiting, 131 S. Ct. 1968, 1973 (2011)
(quoting De Canas v. Bica, 424 U.S. 351, 353, 356
(1976)).  In Lozano, the Third Circuit Court of Appeals
explained that the INA "sets forth the criteria by which
'aliens,' defined as 'any person not a citizen or a
national of the United States,' 8 U.S.C. § 1101(a)(3),
may enter, visit, and reside in this country."  620 F.3d
at 196.  The court observed that, "Under the INA, there
are three primary categories of aliens who may lawfully
enter and/or spend time within the United States: (1)
'nonimmigrants,' who are persons admitted for a limited
purpose and for a limited amount of time, such as
visitors for pleasure, students, diplomats, and temporary
workers, see 8 U.S.C. § 1101(a)(15); (2) 'immigrants,'
who are persons admitted as (or after admission, become)
lawful permanent residents of the United States based on,
inter alia, family, employment, or diversity

27

characteristics, <u>see</u> 8 U.S.C. § 1151; and (3) 'refugees' and 'asylees,' who are persons admitted to and permitted to stay for some time in the United States because of humanitarian concerns, <u>see</u> 8 U.S.C. §§ 1157–58." <u>Id</u>. (footnote omitted). The court continued that, "Aliens wishing to be legally admitted into the United States must satisfy specific eligibility criteria in one of these categories, and also not be barred by other provisions of federal law that determine inadmissibility," and that "Congress has determined that non-citizens who, <u>inter alia</u>, have certain health conditions, have been convicted of certain crimes, present security concerns, or have been recently removed from the United States, are inadmissible, <u>see</u> 8 U.S.C. § 1182, and if detained when attempting to enter or reenter the country, may be subject to expedited removal, <u>see</u> 8 U.S.C. § 1225." <u>Id</u>.

Notwithstanding this classification system, there were approximately 11.2 million unauthorized aliens living in the United States as of March 2010. Pew

28

Hispanic Center, Unauthorized Immigrant Population: National and State Trends, 2010 29 (2011) (Doc. No. 14-2, at 57). These individuals lack lawful authorization for a variety of reasons, including unlawful entry, visa overstay, marriage fraud, and certain felony convictions. See 8 U.S.C. § 1227. This does not mean, however, that the federal government is doing nothing. For fiscal year 2009, Immigrations and Customs Enforcement (ICE) officers averaged 816 arrests a day and deported approximately 912 more, half of which had committed crimes. Ga. Latino Alliance for Human Rights v. Deal, 2011 WL 252072, at *14 (N.D. Ga. June 27, 2011) (Thrash, J.). In fiscal year 2011, ICE removed 396,906 individuals, and nearly 55% of those had committed crimes. ICE Website, Removal Statistics, http://www.ice.gov/removal-statistics/, (last visited December 12, 2011).

Congress has created a number of tools for enforcement of its immigration scheme. Congress has criminalized unlawful entry by an alien and reentry by removed aliens, 8 U.S.C. §§ 1325 & 1326, and made it a

29

crime to "harbor," knowingly or recklessly, an alien lacking lawful immigration status. 8 U.S.C. § 1323(a)(1)(A)(iii). In fact, for 2010, "immigration offenses were prosecuted in federal court more than any other offense." Deal, 2011 WL 2520752, at *14 (citing U.S. Sentencing Commission, 2010 Sourcebook of Federal Sentencing Statistics 11-12 (2010)). Congress, however, has declined to establish criminal penalties relating to the mere presence of unauthorized persons in the country.

The INA tasks the federal government, specifically the Department of Homeland Security (DHS) (which houses ICE), with removing unauthorized aliens and provides detailed guidance for removal procedures, but "it is completely within the discretion of the federal officials to remove persons from the country who are removable." Lozano, 496 F. Supp. 2d at 530. Thus, as a matter of discretion, DHS decides if and when to initiate removal proceedings against unauthorized aliens. As a corollary, federal officials have created priorities for addressing violations of immigration law. As the numbers bear out,

the "federal government gives priority to prosecuting and removing illegal immigrants that are committing crimes in this country and to those who have previously been deported for serious criminal offenses such as drug trafficking and crimes of violence." Deal, 2011 WL 2520752, at *14.

In the current administration, "ICE has adopted clear priorities that call for the agency's enforcement resources to be focused on the identification and removal of those that have broken criminal laws, recently crossed our border, repeatedly violated immigration law or are fugitives from immigration court." ICE Website, supra. For fiscal year 2011, 90% of the 396,906 individuals removed "fell into one of ICE's enforcement priorities." Id. On the other hand, "the federal government frequently exercises its discretion not to try to remove persons from the country even though they may lack lawful immigration status," Lozano 496 F. Supp. 2d at 530 n.6, and the government "permits several categories of persons who may not be technically lawfully present in the United

States to work and presumably live here." Id. at 530-31.

Despite DHS's broad discretion to set priorities regarding which aliens, if any, the executive branch wants to focus on for deportation, the process of removal is not automatic.  Instead, when DHS decides to seek removal, the alien is typically entitled to a hearing before an immigration judge designed to determine whether she may remain in the country.  The immigration judge makes the initial determination as to removability, 8 U.S.C. § 1229a(a)(3), which can be appealed to the Board of Immigration Appeals and, in some instances, the federal courts of appeals. 8 U.S.C. § 1252. Even after those appeals, the Attorney General may cancel removal of certain permanent residents if specific statutory criteria are satisfied.  8 U.S.C. § 1229b(a).  The Attorney General may also grant relief to victims of domestic violence and human rights abuses.  8 U.S.C. §§ 1229b(b)(2) & 1231(b).  And, in certain situations where an unauthorized person cannot be deported--such as a home country's refusal to accept the individual--that

individual cannot be detained indefinitely.  <u>Zadvydas v.</u> <u>Davis</u>, 533 U.S. 678 (2001).  Thus, in addition to setting and regulating immigration classifications, federal law establishes detailed procedures for removing unauthorized aliens.

Two amendments to the INA have focused on undocumented immigrants' employment and access to social services: the Immigration Reform and Control Act of 1986 (IRCA), Pub. L. No. 99-603, 100 Stat. 3359, and the Illegal Immigration Reform and Immigrant Responsibility Act (IIRIRA), Pub. L. No. 104-208, 110 Stat. 3009 (1996). These statutes created several mechanisms, such as DHS's Systematic Alien Verification for Entitlements program (SAVE), that assist in the implementation of those reforms by permitting States and localities to verify an immigrant's lawful status.  As its name indicates, SAVE was designed to assist States in determining an alien's eligibility for certain public benefits programs, not for determining an alien's lawful status.  42 U.S.C. § 1320b-7.  Similarly, 8 U.S.C. § 1373(c) mandates that ICE

"respond to an inquiry by a Federal, State, or local government agency, seeking to verify or ascertain the citizenship or immigration status of any individual within the jurisdiction of the agency for any purpose authorized by law, by providing the requested verification or status information."[8]  Currently, law enforcement officials are the only officials authorized to verify immigration status under § 1373(c), which is done through the Law Enforcement Support Center (LESC). See United States v. Arizona, 641 F.3d 339, 374 (9th Cir. 2011); United States v. Arizona, 703 F. Supp. 2d 980, 996 (D. Ariz. 2010) (Bolton, J.).

### b. "Regulation of Immigration"

The plaintiffs' first preemption claim is that applying § 30 of HB 56 to Alabama's manufactured home registration requirements constitutes an impermissible

---

8.  SAVE and Section 1373(c) are distinct from the government's E-Verify program, which employers may use to verify an employee's immigration status.

"regulation of immigration." The plaintiffs are substantially likely to prevail on this claim. Through Article I, the Constitution provides that it is the power of Congress, and Congress alone, "To establish an uniform Rule of Naturalization." U.S. Const. art. I, § 8 cl. 4. As a result, "the States enjoy no power with respect to the classification of aliens." Plyler v. Doe, 457 U.S. 202, 225 (1982). The authority "to regulate immigration is unquestionably exclusively a federal power." DeCanas, 424 U.S. at 354; see also Truax v. Raich, 239 U.S. 33, 42 (1915) (explaining that "the authority to control immigration is vested solely in the Federal Government").

In DeCanas, the Supreme Court held that, because the Constitution vests the federal government with authority over immigration and naturalization, a State's "regulation of immigration" is preempted. 424 U.S. at 355. The Court, however, recognized that not "every state enactment which in any way deals with aliens is a regulation of immigration and thus per se pre-empted" by the federal government's exclusive federal power to

regulate immigration.  Id.   Instead, a State "regulates immigration" when it makes "a determination of who should or should not be admitted into the country, and the conditions under which a legal entrant may remain."   Id.

DeCanas applied that concept to a California law that made it unlawful for employers to hire unauthorized aliens and required employers to use federal standards to make determinations about immigration status.[9]  The Court concluded that California's law was not a regulation of immigration because the state law regulated only employment and not presence.  Id. at 359-61.

The crux of the issue here is whether § 30 of HB 56, as applied to § 40-12-255, is preempted as a "regulation of immigration" because it "alters the conditions" under which an alien "may remain" in Alabama.  It appears to do just that.  By effectively barring undocumented immigrants from owning an entire class of dwellings, the

---

9.  At the time, Congress had yet to criminalize the employment of unauthorized aliens.  It now has.  See 8 U.S.C. § 1324(a)(1)(A).

36

statute goes to the very core of an immigrant's residency. Unlike laws related to the employment of undocumented or unauthorized aliens, which fall under States' traditional police powers, see Whiting, 131 S. Ct. at 1973, this case is about an immigrant's residence, which the State has no power to regulate. See Takahashi v. Fish & Game Comm'n, 334 U.S. 410, 419 (1948); Yo v. United States, 185 U.S. 296, 302 (1902).

As mentioned above, every federal court that has considered a locality's attempt to regulate immigration by limiting access to housing for individuals who cannot prove citizenship or lawful residence has been found preempted. Several of these courts did so on the basis that the laws were "regulations on immigration."  The court finds these decisions persuasive.

First, in Farmers Branch II, the court concluded that a local ordinance prohibiting individuals "not lawfully present" from occupying rental property within the city was a regulation of immigration.  Acknowledging that federal law allows cities to condition certain local

37

benefits on lawful presence, see 8 U.S.C. § 1621, the court rejected the city's argument that denying undocumented aliens the ability to obtain rental property in the jurisdiction was a "public benefit." Farmers Branch II, 701 F. Supp. 2d at 854. Instead, the ordinance imposed "additional local restrictions based on federal immigration classifications on those who wish to remain in" the jurisdiction. Id. at 855. "Local regulation that conditions the ability to enter private contract for shelter on federal immigration status is of a fundamentally different nature than the sorts of restrictions on employment or public benefits that have been found not to be preempted regulations of immigration." Id. Importantly, as the court explained, "restrictions on residence directly impact immigration in a way that restrictions on employment or public benefits do not" because restrictions on housing fundamentally

impact an immigrant's ability to remain in a State.  Id.
As such, the ordinance was preempted.[10]

Likewise, in Lozano v. City of Hazleton, the Third
Circuit addressed a city ordinance regarding immigration,
much like HB 56.  620 F.3d at 219-24.  The ordinance had
two sets of provisions: employment provisions, which
imposed sanctions on hiring undocumented workers, and
housing provisions, which made it unlawful to "let, lease
or rent a dwelling unit to an illegal alien" and made
"legal immigration status a condition precedent to
entering into a valid lease."  Id. at 179.  The housing
provisions, Lozano held, were "attempts to regulate
residence based solely on immigration status," and were
not within States' traditional police powers because
"[d]eciding which aliens may live in the United States

---

10.    Commissioner Magee concedes that "the
manufactured home decals at issue are not among the
'public benefits' listed in 8 U.S.C. §§ 1611 or 1621."
Magee Supp. Br. 14 n.7 (Doc. No. 80, at 14 n.7).  Given
this concession, the court has trouble seeing how the
registration decals at issue here would not fall within
this line of authority as direct regulations of residency
based on immigration status.

has always been the prerogative of the federal government." Id. at 220. Because the "housing provisions regulate[d] which aliens may live" within the jurisdiction, the court found them to be preempted. Id.

To be sure, § 30 does not, on its face, condition residence in Alabama upon an immigration classification. As applied to § 40-12-255, however, the section is the equivalent of such a prohibition, at least for those owning manufactured homes on rented land. Commissioner Magee admits as much: "Section 30 as applied in this instance means that the individual Plaintiffs cannot continue living in Alabama in manufactured homes they own and maintain on certain property without violating either Section 30 or Ala. Code § 40-12-255 or causing others to violate Section 30." Def. Proposed Facts 8 (Doc. No. 64, at 8).[11] Congress has never gone so far as to support the

_____

11. Importantly, HB 56, as written, goes further than just manufactured homes. Section 13 of HB 56 makes it a crime to enter into a rental agreement with an alien if the "person knows or recklessly disregards the fact that the alien is unlawfully present in the United (continued...)

idea that aliens residing in this country cannot own a

home and, further, must forfeit one if they have paid for

it.  This prohibition on ownership of a manufactured home

on the basis of an immigrant's classification likely

amounts to a "regulation of immigration" under DeCanas.

Commissioner Magee contests this court's reliance on

cases like Lozano and Farmers Branch II, pointing out

that § 30 is not a "total ban" on housing and that the

plaintiffs can still reside, in some limited ways, within

the State of Alabama.  Nonetheless, while the defendants'

specific application of § 30 does not prohibit every

unlawful immigrant from living within the borders of the

State, it serves as an effective bar for many

unauthorized persons who already own their manufactured

_____

11.(...continued)
States."  HB 56 § 13(a)(4) (Doc. No. 31-1, at 36).   In
effect, this provision requires private landlords,
housing managers, and even those renting rooms to friends
to verify an individual's immigration status before
renting a unit.    See id. § 13(g) (describing
enforcement); Hammon Tr. (Doc. No. 68, at 40-41).   This
section has already been enjoined as likely preempted.
United States v. Alabama, 2011 WL 4469941, at *41-45.

41

home.  The relevant fact in <u>Lozano</u> and <u>Farmers Branch II</u> was not that the residency requirements were total bans. They were not: the restrictions applied to rentals, but not home ownership.  Exclusion from certain classes of private housing was the crucial problem in each instance. In this way, § 30's application goes further than either of these "total bans" on rental property, for it actually interferes with the right of home ownership.

Analogous to these cases, the manner in which § 30, as applied to the manufactured homes statute, constitutes a "regulation of immigration" can be seen by looking at the possible cumulative effect of these sorts of laws. In the first case, as it is with § 13 of HB 56 and the ordinances in <u>Lozano</u> and <u>Farmers Branch II</u>, undocumented immigrants cannot live in rental property; in the second case, this one, they can no longer own the manufactured home they have lawfully purchased.  The next case is unknown, but this sort of incremental intrusion is precisely how the slippery-slope toward an actual all-out ban for undocumented immigrant residency works.  <u>Cf.</u>

generally Cristina M. Rodriguez, The Significance of the Local in Immigration Regulation, 106 Mich. L. Rev. 567, 569 (2008) (describing the thousands of immigration bills recently enacted); Eugene Volokh, The Mechanisms of the Slippery Slope, 116 Harv. L. Rev. 1026 (2003).

Another cumulative effect has to do with the scope of preemption analysis: if every State adopted the rental ordinances and manufactured home ownership bans seen here, undocumented immigrants' residency in these classes of housing would be impossible nationwide.  The State cannot "impose an auxiliary burden upon the ... residence of aliens that was never contemplated by Congress." Farmers Branch II, 701 F. Supp. at 855 (quoting Toll v. Moreno, 458 U.S. 1, 12 (1982) (internal quotes and further citation omitted)).  These "auxiliary burdens," as seen from the shift between rental in prior cases to actual ownership here, is why the court's perspective is not only Alabama's law.  If Alabama "can regulate as it has here, then so could every state or locality." Lozano, 620 F.3d at 221; see also Rowe v. N.H. Motor

Transp. Ass'n, 552 U.S. 364, 373 (2008) (rejecting a the argument that a law was not preempted because it would not apply nationally, since allowing the State to set this requirement "would allow other states to do the same"). As the Third Circuit reasoned: "'[W]e can imagine the slippery slope ... if every local and state government enacted laws purporting to determine that ... [certain persons] could not stay in their bounds. If every city and state enacted and enforced such laws ... the federal government's control over decisions relating to immigration would be effectively eviscerated.'" Lozano, 620 F.3d at 222 (quoting Farmers Branch I, No. 3:08-cv-1551-B, Hrg. Tr. at 136 (N.D. Tex. Sept. 12, 2008) (Lindsay, J.)).

Put differently, through the Constitution the federal government has the exclusive authority to authorize an immigrant's entry and exit from the country. By necessity, federal law must also control the time in between: an immigrant's residency. Congress has chosen a uniform policy for regulating immigrant residency

within the United States, which has not meant deporting every removable aliens and instead allowing some to stay.

Commissioner Magee seems to acknowledge that a residency requirement should be preempted under <u>DeCanas</u>. <u>See</u> Magee Supp. Br. 8-9 (Doc. No. 80, at 8-9) (attempting to distinguish this case from other residency requirements). Regardless of whether § 30's application to § 40-12-255 creates a "total ban" on residency, it is undisputed that it does have this effect for many manufactured home owners in Alabama and does so on the basis of immigration status. That fact is dispositive: "The legal result must be the same, for what cannot be done directly cannot be done indirectly. The Constitution deals with substance, not shadows. Its inhibition was leveled at the thing, not the name." <u>Cummings v. Missouri</u>, 71 U.S. 277, 325 (1866).

### c. Implied Preemption

Because "the regulation of aliens is so intimately blended and intertwined with responsibilities of the

national government," where the government acts any state law must yield.  Hines v. Davidowitz, 312 U.S. 52, 66 (1941).  As such, where the federal government, "in the exercise of its superior authority in th[e] field, has enacted a complete scheme of regulation ... states cannot, inconsistently with the purpose of Congress, conflict or interfere with, curtail or complement, the federal law, or enforce additional or auxiliary regulations."  Id. at 66-67.  Indeed, the Supreme Court has long acknowledged that federal immigration policy "has become about as firmly imbedded in the legislative and judicial tissues of our body politic as any aspect of our government."  Galvan v. Press, 347 U.S. 522, 531 (1954).

Accordingly, even in the absence of express preemption, a federal law's "structure and purpose" can trump a state statute in two ways.  Cliff v. Payco Gen. Am. Credits, Inc., 363 F.3d 1113, 1122 (11th Cir. 2004).  First, "state law is naturally preempted to the extent of any conflict with a federal statute."  Id.  A conflict

occurs when a state law frustrates the "accomplishment of a federal objection," Geier v. Am. Honda Motor Co., 529 U.S. 861, 873 (2000), or "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." Hines, 312 U.S. at 67. Second, when "Congress intends federal law to 'occupy the field,' state law in that area is preempted." Crosby, 530 U.S. at 372.

The INA reflects Congress's objective of exerting federal control over an immigrant's residency in this country. The court finds that the plaintiffs are substantially likely to prevail on their claim that § 30 of HB 56 is conflict preempted by the INA. Section 30's application to Alabama's manufactured home statute creates at least two obstacles to federal immigration policy. First, Alabama's policy regulates an immigrant's residency in contradiction to federal policy. Second, HB 56 imposes an impermissible verification scheme in both practice and theory.

47

Like the legislation at issue in <u>Lozano</u>, § 30 "assume[s] that the federal government seeks the removal of all undocumented aliens." <u>Lozano</u>, 496 F. Supp. 2d at 531. This premise is legally and factually wrong. As discussed above, it is the federal government--not the States--that gets to determine who are permitted into this country and who get to stay once they are here, and the federal government does not seek to remove all undocumented aliens from the country. The mandatory denial of a mobile-home permit therefore ignores the INA's careful balancing of executive discretion, administrative process, and judicial review. <u>See</u> <u>Plyler</u>, 457 U.S. at 225 ("The States enjoy no power with respect to the classification of aliens.").

In short, HB 56 seeks removal of unauthorized persons that the Executive Branch has not initiated removal proceedings against. The sponsors of HB 56 declared that their goal was the "self-deportation" of unauthorized persons. <u>See</u>, <u>e.g.</u>, Transcript of Nov. 23, 2011 Hearing, Doc. No. 68, at 17 (Statement of Representative Hammon);

48

<u>id</u>. at 118 (Statement of Senator Beason).  As Senator Beason explained, HB 56 was "designed to reduce the number of illegal aliens in the state." <u>Id</u>.  The States, however, cannot accomplish this goal through residency restrictions.

In addition, some unauthorized aliens are not removable under federal law.  For instance, Congress has established the category of "temporary protective status" (TPS), <u>see</u> 8 U.S.C. § 1254a, whereby the Secretary of Homeland Security can classify foreign countries as too unsafe or impractical to deport foreign nationals to.  Typically, this occurs if there is an ongoing armed conflict or environmental disaster in the area.  As of December 1, 2011, nationals of El Salvador, Haiti, Honduras, Nicaragua, Somalia, Sudan, and South Sudan are eligible for TPS.  Alabama's policy of encouraging "self-deportation" of these individuals is an obstacle to federal policy.

Section 30's application to § 40-12-255 also runs counter to the verification procedures that Congress has

established.  Under § 30, state and local officials must utilize either SAVE or § 1373(c) to verify an alien's lawful status before conducting a business transaction. Criminal enforcement of § 30 is limited to § 1373(c) verification, presumably because that system is more accurate.  Section 30(f) makes clear that state and local officials "shall not attempt to independently make a final determination of whether an alien is lawfully present in the United States."

While § 30 attempts to piggyback on DHS's verification programs, it fails to account for the nuances of federal immigration law.  To take just one example: removal and asylum decisions are notoriously unpredictable.  See, e.g., Benslimane v. Gonzales, 430 F.3d 828, 829 (7th Cir. 2005) (Posner, J.) (noting a reversal rate, in whole or in part, of 40% of Board of Immigration Appeals decisions); Jaya Ramji-Nogales, Andrew I. Schoenholtz & Philip G. Schrag, Refugee Roulette: Disparities in Asylum Adjudication, 60 Stan. L. Rev. 295 (2007) (demonstrating substantial variability

between the circuits in immigration decisions).   While
this lack of uniformity is certainly troubling, it
underscores the point that state and local officials are
ill-equipped to make removal decisions.   Indeed, in
"light of the discretionary federal power to grant relief
from deportation, a State cannot realistically determine
that any particular undocumented [person] will in fact be
deported until after deportation proceedings have been
completed." Plyler, 457 U.S. at 226; see also id. at 236
(Blackmun, J., concurring) ("[T]he structure of the
immigration statutes makes it impossible for the State to
determine which aliens are entitled to residence, and
which eventually will be deported.").

Thus, even assuming that HB 56's verification
procedures were perfectly synchronized with the federal
government's processes, § 30 would still pose an obstacle
to congressional purpose.   The reason is simple:
verification reveals only an immigrant's status at a
particular moment in time, which says nothing about
whether the federal government has decided to remove that

person from the country.  <u>Cf</u>. 68 Fed. Reg. 58301, 58302 (Sept. 28, 2000) ("A Systematic Alien Verification for Entitlements (SAVE) response showing no Service record on an individual or an immigration status making the individual ineligible for a benefit is not a finding of fact or conclusion of law that the individual is not lawfully present."). Magee is making an impermissible leap from undocumented status to removal. Assuming that the former requires the latter runs afoul of federal policy.

Finally, Commissioner Magee contends that § 30's application to the manufactured home statute is simply an exercise of the State's licensing authority. She relies principally on <u>Whiting</u>, where a plurality of the Supreme Court held that States may require businesses to use E-Verify and may revoke or suspend business licenses as punishment for hiring undocumented workers. 131 S. Ct. at 1968.

<u>Whiting</u> is inapposite for at least two reasons. First, the <u>Whiting</u> Court addressed licensing in a

distinct context: the employment of unauthorized aliens. Congress has expressly given States discretion to issue licenses in this area, thereby saving these schemes in this area from being preempted.  IRCA provides: "The provisions of this section preempt any State or local law imposing civil or criminal sanctions <u>(other than through licensing and similar laws) upon those who employ, or recruit or refer for a fee for employment, unauthorized aliens</u>." 8 U.S.C. § 1324a(h)(2) (emphasis added).  The <u>Whiting</u> Court found that Arizona's license revocation statute fit squarely within this employment-specific savings clause and was not preempted. <u>Whiting</u>, 131 S. Ct. at 1977-78.  No similar savings clause exists for state regulation of immigration residency requirements. HB 56, therefore, cannot claim this safe harbor.

Second, assuming the "annual registration free" is an exercise of "licensing" authority, in this case the license intrudes into a quintessentially federal domain:

residency requirements.[12]  As discussed at length above,
applying § 30 of HB 56 to § 40-12-255 has erected a
residency requirement for mobile home owners living on
rented property.   Preemption cannot be escaped by
recasting this prohibition as a universal "licensing"
requirement.   The provision is directed at a specific
group: aliens who cannot establish their lawful
residency.   The Supreme Court long ago made clear that
States cannot require the registration of aliens.  <u>Hines</u>,
312 U.S. at 56-60 (discussing Pennsylvania's Alien
Registration Act).  Accordingly, because this application
of § 30 establishes a de facto residency requirement
through its annual decal process, it is preempted.[13]

---

12. Consistent with the line drawn by the northern
district between business or driver's "licenses" and
"registration fees," <u>see</u> <u>United States v. Alabama</u>, 2011
WL 4469941, at 60 n.25, the court has doubts as to
whether § 40-12-255's annual registration scheme is even
a even "license" within the meaning of <u>Whiting</u>.

13. As applied to § 40-12-255, § 30 of HB 56 is field
preempted for essentially the same reasons that it is
conflict preempted.

Therefore, through the creation of a residency regulation for unauthorized aliens, Alabama has usurped federal control over immigration policy.  Whether this incursion is labeled express or conflict preemption, the plaintiffs have established by a substantial likelihood that it is void under the Supremacy Clause.[14]

_____

14. Before closing its discussion of preemption, the court adds that, if HB 56, with its broad and far-reaching provisions, is viewed synergistically as a whole rather than myopically provision by provision and is viewed in application rather than facially, an interesting question is presented as to whether the statute, if the evidence shows that its clear effect, and perhaps purpose, is to rid the State of certain aliens completely (rather than to deny them of a state benefit here and there), is, in reality, nothing short of a local immigration statute and thus preempted.  Cf. Leg. Session (Doc. No. 14-3, at 27) (as Representative Micky Ray Hammon put it: "This [bill] attacks every aspect of an illegal immigrant's life.  They will not stay in Alabama. ... [T]his bill is designed to make it difficult for them to live here so they will deport themselves.").  This question of synergy, that is, whether HB 56's provisions function together to produce a result (deportation) not independently obtainable, is not presented here. Nevertheless, when § 30, as applied  to § 40-12-255, is viewed in the comprehensive context of all of HB 56's provisions and the limited evidence so far of the impact, intended or not, of these provisions, including § 30, the conclusion that § 30 is a residency restriction and thus preempted is reinforced.

## 2. Fair Housing Act

The FHA prohibits actions that "make unavailable" or "deny" a dwelling "to any person because of" his race or national origin.  42 U.S.C. § 3604(a). The statute also proscribes actions that "discriminate against any person in the terms, conditions, or privileges ... in the provision of services or facilities in connection therewith[] because of" his race or national origin.  Id. § 3604(b).

The plaintiffs allege that the defendants' application of § 30 of HB 56 to Alabama Code § 40-12-255 violates both subparts (a) and (b) of § 3604, that is, the FHA.  It is undisputed that, as applied to § 40-12-255, § 30 effectively "makes unavailable" a manufactured home and changes the terms or conditions of residing in a manufactured home by conditioning residence on a demonstration of lawful presence in the United States. The plaintiffs argue that HB 56 discriminates against

56

Latinos.[15]    Commissioner   Magee   counters   that   HB   56

complies with the FHA because it has nothing to do with

race  or  national  origin;  it  has  to  do  with  lawful

immigration status, which is beyond the ambit of the FHA.

The    FHA    recognizes    claims    of    intentional

discrimination,  as  well  as  those  brought  under  a

disparate-impact theory.  See Schwarz v. City of Treasure

Island, 544 F.3d 1201, 1216-17 (11th Cir. 2008); Jackson

v. Okaloosa County, 21 F.3d 1531 (11th Cir. 1994).[16]  The

---

15.   As relevant here, the court uses the terms
"Latino" and "Hispanic" interchangeably.   See, e.g.,
Valle v. Secretary for Dep't of Corrs., 478 F.3d 1326,
1229-30 (11th Cir. 2007).   In addition, both Latino and
Hispanic backgrounds are often treated as encompassing
both race and national origin, Booth v. Pasco County,
2010 WL 2757209, at *10 (M.D. Fla. 2010) (Moody, J.), and
the concepts of race and national origin, as they pertain
here, are difficult to separate.   See Ortiz v. Bank of
Am., 547 F. Supp. 550, 560-62 (E.D. Cal. 1982) (Karlton,
J.).   Accordingly, the court treats the plaintiffs'
argument of discrimination on the basis of being Latino
as encompassing both race and national discrimination and
does not differentiate between the two concepts.

16. The Supreme Court recently agreed to hear a case
addressing: (1) whether disparate impact is available
under the FHA and, if so, (2) what method of proof
governs such a claim.  Gallagher v. Magner, 619 F.3d 823
(8th Cir. 2010), cert. granted, ___ U. S. ___, ___ S. Ct.
(continued...)

plaintiffs have alleged violations of the FHA under both theories, and the court finds that they are likely to succeed on each claim.

Unlike the preemption claim, which "must be based on the language of the Act alone and not the motivation for its enactment," Hispanic Interest Coalition, 2011 5516953, at *17, the discrimination claims under the FHA require an inquiry into, among other things, the motivation for passing the statute, and they call for a more searching inquiry into the background of HB 56.

### a. Intentional Discrimination

The plaintiffs first argue that HB 56 was passed to intentionally discriminate against Latinos in violation of the FHA.  To prove intentional discrimination, the plaintiffs must demonstrate that race or national origin had "some role" in the passage of HB 56.  Sofarelli v.

---

16.(...continued)
___, 2011 WL 531692 (Nov. 7, 2011).  Until that case is decided, the court looks to existing precedent.

Pinellas County, 931 F.2d 718, 722 (11th Cir. 1991);

United States v. Pelzer Realty Co., 484 F.2d 438, 443

(5th Cir. 1973).  In making this determination under the

FHA, the Eleventh Circuit has followed the factors

outlined in Arlington Heights v. Metropolitan Housing

Development Corp., 429 U.S. 252, 266 (1977).  See

Hallmark Developers, Inc. v. Fulton County, 466 F.3d

1276, 1283-84 (quoting United States v. Hous. Auth. of

City of Chickasaw, 504 F. Supp. 716, 727 (S.D. Ala. 1980)

(Hand, J.), which was quoting Arlington Heights).

Though an Equal Protection case, the Arlington

Heights standard is used in FHA cases generally, e.g.,

Hallmark, 466 F.3d at 1283-84, and is of particular

relevance here because the court addressed what it means

for a multi-member body, such as the Alabama legislature,

to take an action, at least in part, "because of" an

impermissible factor.  As in the FHA context, "[p]roof of

racially discriminatory intent or purpose is required" to

demonstrate that an action is unlawful.  Arlington

Heights, 429 U.S. at 265.  That said, intentional

59

discrimination "does not require a plaintiff to prove that the challenged action rested solely on racially discriminatory purposes," because "[r]arely can it be said that a legislature or administrative body operating under a broad mandate made a decision motivated solely by a single concern or even that a particular purpose was the 'dominant' or 'primary' one." Id. Race or national origin, however, is not just another competing factor for legislators to consider, and, when "there is proof that a discriminatory purpose has been a motivating factor in the decision," judicial deference to the legislative act is no longer justified. Id. at 265-66.

With this in mind, Arlington Heights explained: "Determining whether invidious discriminatory purpose was a motivating factor demands a sensitive inquiry into such circumstantial and direct evidence of intent as may be available." Id. at 266; cf. Hallmark, 466 F.3d at 1283 ("'Because explicit statements of racially discriminatory motivation are decreasing, circumstantial evidence must often be used to establish the requisite intent.'"

(quoting Chickasaw, 504 F. Supp. at 727)). "[W]ithout purporting to be exhaustive," Arlington Heights identified five "subjects of proper inquiry in determining whether racially discriminatory intent existed" in the decision. 429 U.S. at 268

First, the "impact of the official action ... may provide an important starting point. Sometimes a clear pattern, unexplainable on grounds other than race, emerges from the effect of the state action even when the governing legislation appears neutral on its face." Id. at 266. Effect is an important "starting point" because the "impact of an official action is often probative of why the action was taken in the first place since people usually intend the natural consequences of their actions." Reno v. Bossier Parish Sch. Bd., 520 U.S. 471, 487 (1997).

Second, the court may consider the "historical background of the decision ... , particularly if it reveals a series of official actions taken for invidious purposes." Arlington Heights, 429 U.S. at 266. This

also means the court "may take into account any history of discrimination by the decisionmaking body or the jurisdiction it represents." Sylvia Dev. Corp. v. Calvert County, Md., 48 F.3d 810 (4th Cir. 1995); see also Hallmark, 466 F.3d at 1283-85.

Third, and another form of historical background, the court may consider the "specific sequence of events leading up to the challenged decision," which "may shed some light on the decisionmaker's purposes." Arlington Heights, 429 U.S. at 268.

Fourth, both procedural and substantive departures from typical decisionmaking practices can be considered. Arlington Heights, 429 U.S. at 267-68. Substantive departures exist when "factors usually considered important by the decisionmaker strongly favor a decision contrary to the one reached." Id. at 267.

Fifth, "the legislative or administrative history may be highly relevant, especially where there are contemporary statements by members of the decisionmaking body, minutes of its meetings, or report." Id. at 268.

In looking at contemporaneous statements, along with statements made in the sequence of events leading up to the decision, courts are mindful of terms that may appear benign but are in fact "camouflaged racial expressions" or are pretext for animus against a particular group. Smith v. Town of Clarkton, 682 F.2d 1055, 1066 (4th Cir. 1982); see also Greater N.O. Fair Hous. Action Ctr. v. St. Bernard Parish, 648 F. Supp. 2d 805, 811-12 (E.D. La. 2009) (Berrigan, J.); Doe v. Village of Mamaroneck, 462 F. Supp. 2d 520, 530 (S.D. N.Y. 2006) (McMahon, J.).

Further, Arlington Heights recognized that, in "some extraordinary instances the members might be called to the stand at trial to testify concerning the purpose of the official action. Arlington Heights, 429 U.S. at 266 at 268. In such an instance, "a legislator may testify only to his own motivations, his opinion regarding the motivation of the body as a whole, the information on which the body acted, the body's knowledge of alternatives, and deviations from procedural or substantive rules typically employed." Cano v. Davis,

193 F. Supp. 2d 1177, 1180 (C.D. Cal. 2002) (three-judge court) (Morrow, J.).

The court recognizes that "[p]roving the motivation behind official action is often a problematic undertaking," especially when dealing with a body the size of the Alabama legislature. Hunter v. Underwood, 471 U.S. 222, 228 (1985). Nonetheless, Underwood powerfully affirms the approach of looking to legislative purpose through the statements made in legislative deliberation. When considering the Alabama Constitutional Convention of 1901, the Supreme Court looked at evidence demonstrating that the law was "part of a movement" that had a racially discriminatory purpose. 471 U.S. at 229. As the district court had done, Underwood then looked to statements of the Convention's president as "evidence of legislative intent" and went on to consider "the proceedings of the

64

convention, several historical studies, and the testimony

of two expert historians." Id.[17]

_____

17. In a motion in limine, Commissioner Magee argues
that evidence of the legislator's individual statements
are simply irrelevant to determining whether there has
been intentional discrimination on account of race or
national origin.  Mot. In Limine (Doc. No. 40).  Magee is
wrong.   Cases like Arlington Heights and Underwood
definitively establish that contemporaneous statements by
individual decisionmakers are relevant to determining
whether race was a motivating factor for the decision.
As the Supreme Court, the Eleventh Circuit, and other
courts  have recognized in a variety of contexts, where
the court's inquiry centers on finding an improper
purpose, looking into legislators' motives and comments
happens frequently.  Where such information is available,
this inquiry is now the norm, not the exception.  See,
e.g., Easley v. Cromartie, 532 U.S. 234, 253-54 (2001);
Bossier Parish, 520 U.S. at 489; Shaw v. Hunt, 517 U.S.
899, 906 (1996); Miller v. Johnson, 515 U.S. 900, 917-18
(1995); Church of the Lukumi Babalu Aye, Inc. v. City of
Hialeah, 508 U.S. 520, 540-42 (1993); Hallmark, 466 F.3d
at 1284; Pryor v. NCAA, 288 F.3d 548, 563 (3d Cir. 2002);
Church of Scientology v. City of Clearwater, 2 F.3d 1514,
1527-28 (11th Cir. 1993); Goldberg v. Town of Rocky Hill,
973 F.2d 70, 75 (2d Cir. 1992); Goldberg v. Whitman, 743
F. Supp. 943, 947-57 (D. Conn. 1990) (Nevas, J.).

    A further problem with Magee's objection is its
presumption that to find intentional discrimination the
court must find that every legislator acted with a
discriminatory motive.   This is not the standard. As
explained, it is well established that the plaintiffs
must prove that race or national origin played some role
in the decision, that is, race or national origin was a
                              (continued...)

In essence, as the Supreme Court has explained, "the inquiry is practical." Personnel Admin. of Mass. v. Feeney, 442 U.S. 256, 279 n.24 (1979). "What a legislature or any official entity is 'up to' may be plain from the results they achieve, or the results they avoid. Often it is made clear from what has been called ... the give and take of the situation." Id. (internal quotes and citation omitted). Put differently, "[d]iscriminatory intent may be inferred from the totality of the circumstances." LeBlanc-Sternberg v. Fletcher, 67 F.3d 412, 426 (2d Cir. 1995).

To begin, there is substantial evidence that concern for illegal immigration was behind the passage of HB 56. HB 56 itself proclaims that "illegal immigration is causing economic hardship and lawlessness," which is "encouraged" when public agencies "provide public benefits without verifying immigration status." HB 56

---

17.(...continued)
motivating factor for passing the law, not the only one. Arlington Heights, 429 U.S. at 266; Hallmark, 466 F.3d at 1283; Sofarelli, 931 F.2d at 722.

§ 2 (Doc. No. 31-1, at 5).  These problems, HB 56 finds, are exacerbated by the "costs incurred by school districts for the public elementary and secondary education of children who are aliens not lawfully present in the United States," which has created a "compelling need for the State Board of Education to accurately measure and assess the population of students who are aliens not lawfully present in the United States."  Id. When coupled with other policies that "impede and obstruct the enforcement of federal immigration law, undermine the security of our borders, and impermissibly restrict the privileges and immunities of the citizens of Alabama," it is in Alabama's "compelling public interest to discourage illegal immigration."  Id.  Moreover, numerous statements by both Alabama Senators and Representatives confirm these findings.

Nevertheless, after considering the factors listed in Arlington Heights--the effect of the bill, its historical background, the sequence of events leading up to its enactment, its substantive departures, and the

67

contemporaneous statements of legislators--the court is convinced that, while the record clearly establishes that concern about illegal immigration was a substantial factor behind the passage of HB 56, there is substantial evidence that race and national origin also played a role in the passage of HB 56.

First, the effect of HB 56 falls disproportionately upon Latinos. Until recently, Alabama had only a minuscule Latino population. Today, however, Latinos comprise approximately 3.7% of the State's population. And like the broader national trend, the unauthorized immigrant population in Alabama has increased dramatically in recent years: from 5,000 in 1990 to 120,000 in 2010. Though unauthorized immigrants account for roughly 2.5% of the State's population, id. at 52, the overwhelming majority (between 65% and 77%) of these immigrants in Alabama are Latino.[18]  In short, Latinos

_____

18.  These numbers are based upon record evidence, and three sources in particular: (1) the 2008-2010 American Community Survey, conducted by the U.S. Census (continued...)

make up a disproportionate share of the State's foreign-born population and constitute a large majority of the State's non-citizen population, which is why HB 56 has the greatest impact on this community.

Second, while the plaintiffs do not allege that there were any deviations of procedure with respect to HR 56, they do argue that the State departed substantively from values it would normally prioritize when it passed the statute.[19]   The court agrees that, with HB 56, the State

---

18.(...continued)
Bureau; (2) the Pew Hispanic Center's Report, Unauthorized Immigrant Population: National and State Trends, 2010 (2011), which reproduces and analyzes 2010 Census Data; and (3) a DHS report analyzing data from 2009, Estimates of the Unauthorized Immigrant Population Residing in the United States: January 2009 4 (2010). See generally Crook Decl. (Doc. No. 14-2).

19.   Specifically, the plaintiffs argue that HB 56 undermines (1) collection of revenues, (2) fostering compliance with state licensing laws, and (3) preventing homelessness and family disruption.   Though neither defendant has submitted a response to this argument, the court has carefully considered each alleged departure. The current evidentiary record fails to support this argument except as to disruption of family and, in particular, the burdening of children of undocumented immigrants, which is the only aspect of the argument addressed by the court.

departed dramatically from the way it has historically treated, indeed, prioritized the treatment of, children. Alabama, through each of its constitutions, has viewed education as a crucial component to a child's welfare, see Opinion of the Justices, 624 So.2d 107, 158 (Ala. 1993), abrogated on other grounds by Ex Parte James, 836 So.2d 813 (Ala. 2002), and treats characteristics of a child's parents that detract from education (like poverty or an unsafe environment) as obstacles to overcome.  In fact, when "a parent is unable or unwilling to meet the basic parental responsibilities to provide the child food, clothing, shelter, health care, education, nurturing, and protection," a juvenile court has grounds to terminate parental rights.  B.B.T. v. Houston County Dep't of Hum. Servs., 2011 WL 5436314, at *2 (Ala. Civ. App. Nov. 10, 2011) (citing 1975 Ala. Code 12-15-319). In those circumstances, the State steps in to provide for the child, regardless (and despite) of what happens to the parent or what any decisions they have made.

In stark contrast, for the sake of addressing illegal immigration, HB 56 departs from the State's general treatment of children.  To that end, HB 56 attempts to combat immigration in two ways.  First, the statute envisions reporting to the federal government the "unfair" costs of immigration borne by the State due to its lax immigration enforcement.  Second, HB 56 provides strong incentives for undocumented aliens to leave the State (or "self-deport") even if, and despite the fact that, their children are U.S. citizens.

Specifically, § 28 of HB 56 serves the first goal by requiring "[e]very public elementary and secondary school" in the State to "determine whether the student enrolling in the public school was born outside the jurisdiction of the United States" and then requires each school district to send that information to the Alabama Board of Education, which must then compile an annual report regarding the costs of educating unlawfully present children.  HB 56 § 28 (Doc. No. 31-1, at 57). The second goal is achieved through an in terrorem

mechanism: schools must record whether a student "is the child of an alien not lawfully present in the United States." Id. This requirement relies on the strong disincentive parents have to reveal to schools that their U.S. citizen children have parents that are "not lawfully present in the United States."

The plaintiffs have submitted evidence demonstrating that HB 56 is especially tough on the "mixed status" families, "where one or more of the family members are U.S. Citizens or lawful permanent residents" and other members of the family are not. Ctr. For Am. Progress, Top 10 Reasons Alabama's New Immigration Law is a Disaster for Families (Nov. 15, 2011), in (Doc. No. 42-3, at 110).[20] As reported by the Center for American Progress, "85% of the children of Alabama's undocumented

_____

20. More pejoratively, these children are referred to as "anchor babies," which, as Representative Hammon explained, is "a term that a lot of people use to say that illegal immigrants come to the country and have babies that are U.S. citizens, and that gives them a reason to be able to stay here." Hearing Tr. (Doc. No. 68, at 28).

immigrants live in 'mixed status' families,'" and "the Urban Institute estimates that 28,000 U.S. citizen children in Alabama have noncitizen parents."  Id.

Burdening the education of children as a method for tracking their parents' wrongs is a substantive departure from prior legislative enactments of the state; instead, as the parental-termination statute indicates, the typical goal is just the opposite.  A survey of other Alabama statutes demonstrates this point.  For instance, the Alabama Department of Youth Services was created to "promote and safeguard the social well-being and general welfare of the youth of the state," and, to achieve this goal, among other, the State is tasked with providing for the "promotion and improvement of community conditions, programs and resources to aid parents in discharging their responsibilities for the care, development and well-being of their children."  1975 Ala. Code § 44-1-1. Likewise, when establishing the Alabama Council on Family and Children, the legislature found that "there is at present a need in Alabama to coordinate, at the state and

73

local level, the efforts of existing providers of services supporting early childhood development and family involvement in education." 1975 Ala. Code § 16-1-16.1. Other parts of Alabama law recognize that parents play an integral role in their child's education and that there is a close "interrelationship of the family life of a child and the educational achievement of the child." 1975 Ala. Code. § 16-28-2.2; see also id § 16-40A-1 (contemplating a supportive, collaborative role between schools and families to prevent drug abuse and teen pregnancy). Indeed, Alabama law specifically recognizes the harm caused to children by being uprooted from their schools or losing support based upon their parents' decisions. See, e.g., 1975 Ala. Code. § 15-44B-1 (creating a compact "to remove barriers to education success imposed on children of military families because of frequent moves and deployment of their parents").

HB 56 is in direct conflict with these substantive values. No other statute in the State views the decisions of a parent, even if unlawful, as a

justification for taking actions that will have an adverse effect on school children. The State usually attempts to protect children from the negative consequences of their parents' conduct, not punish them for it. Indeed, as the Supreme Court has explained, "legislation directing the onus of a parent's misconduct against his children does not comport with fundamental conceptions of justice." Plyler, 547 U.S. at 220.

Nor does this burden solely fall upon students who are themselves undocumented immigrants. To the contrary, this substantive departure relies on a child's citizenship status as part of the problem. Thus, HB 56 targets U.S. citizens that are children--and who often have no choice in the matter--solely on the basis of their parents' immigration status, something previously unseen in Alabama. This feature thus takes HB 56 beyond the problem of immigration: it explicitly reaches U.S. citizens as well. Targeting citizens suggests that "illegal immigrants" do not constitute the entire problem

addressed by the HB 56; some other group, not just immigrants, are a component of the perceived problem.

This is not to say that the State may not shift course, or alter its substantive values (for doing so is often a measure of progress).  But such callous disregard for children is not located in any other portion of Alabama law; from provisions that ensure military children are not disadvantaged by frequent moves to strong enforcement for child support, Alabama has recognized that the actions of a parent and the conditions of the family have a direct impact on children.  HB 56, however, departs from these values, and does so significantly for one narrow class of children: those whose parents are undocumented immigrants.

In sum, the court finds that the evidence in this record indicates that HB 56 is a substantive departure from the State's typical treatment of families and children in particular; in other words, the court has serious doubts that children--and, in particular, children who are actually citizens of this Nation--who

are of a different hue, race, and nationality would have been treated so adversely. "[T]he factors usually considered important by the decisionmaker strongly favor a decision contrary to the one reached." <u>Arlington Heights</u>, 429 U.S. at 267.

Moreover, that HB 56's treatment of children in mixed status families, who are overwhelmingly Latino, is so markedly different from the State's historical treatment of children in general suggests strongly that the difference in treatment was driven by animus against Latinos in general and thus that the statute was discriminatorily based.

Third, with regard to the <u>Arlington Heights</u> factors of background and contemporaneous statements of legislators, two concerns counsel that these two factors should be considered with caution but still critically. The first concern is that, throughout its history, the United States has experienced multiple waves of immigrants. In turn, these influxes often produce backlash. <u>See</u> <u>Mojica v. Reno</u>, 970 F. Supp. 130, 145

(E.D. N.Y. 1997) (Weinstein, J.) ("It is well known that prejudice against the Irish, the Chinese, the Japanese, the Italians, the Jews, the Mexicans and other emerged as these groups emigrated in substantial numbers."). Cyclical patterns of immigration by definable groups heighten ethnic and religious tensions. In the 1830s to 1850s, anti-Catholic sentiment accompanied the "Know Nothing" party's opposition to Irish and German immigrants. John Higham, <u>Strangers in the Land: Patterns of American Nativism, 1860-1925</u>, at 3-5 (2002 ed.). A dramatic increase in Asian immigrants on the West Coast resulted in the passage of "exclusion" acts that prohibited immigration from China, Japan, and other Asian nations. <u>See</u> <u>Lozano</u>, 496 F. Supp. 2d at 557 & n.86 (discussing exclusion acts passed from the 1880s to the 1920s). The late nineteenth century also witnessed a rise in anti-Semitism in response to Jewish immigration from Eastern Europe. Higham, <u>supra</u>, at 67. The "most marked xenophobic" period in American history was the 1920s, when Congress closed the "immigration door [in]

78

favor[] of West Europeans over Italians, Jews, Asians and others through numerical restrictions by country." Mojica, 970 F. Supp. at 145. Latino immigrants have also faced discrimination following substantial migration into the country. In 1954, for example, hundreds of thousands of undocumented Mexican immigrants were deported during "Operation Wetback." See generally Juan Ramon Garcia, Operation Wetback: The Mass Deportation of Mexican Undocumented Workers in 1954 (1980).

While this background teaches that backlashes to influxes of immigrants have been regularly a part of our national history, it does not warrant the conclusion that, in Alabama, HB 56 was product of such backlash. This history does, however, teach that legislation that comes on the heels of a substantial immigrant influx--in particular, where the legislation, as demonstrated above, has a disproportionate impact on these immigrants--should be eyed carefully.

The court's second concern is the fact that, in their statements about HB 56, Alabama legislators often spoke

about illegal immigrants and Latinos in the same breath and the fact that Latinos were mentioned often in the debate on HB 56 should not be taken as conclusive, or even necessarily indicative, that Latinos were the discriminatory target of HB 56. The plaintiffs themselves have argued, and the court has agreed, that Latinos make up 64.8% of the non-citizens residing in Alabama. The topic of Latinos is unavoidable in the discussion immigration in Alabama. Indeed, legislative arguments against the passage of HB 56 often centered on the statute's impact on Latinos.

At the same time, however, the court must be sensitive to the use, in the legislative debates, of illegal immigrant as a code for Latino or Hispanic, with the result that, while addressing illegal immigrants was the target, discriminating against Latinos was the target as well. This use is dramatically reflected in how HB 56's drafter, Representative Hammon, conflated race and immigration status. After a reporter inquired about Hammon's oft-repeated comment that "Alabama has the

second-fastest-growing illegal immigrant population in the nation" and asked for evidence substantiating Hammon's claim, Hammon sent the journalist a news article that indicates Alabama's <u>Hispanic</u> population had the second-largest percentage growth between 2000 and 2010, and says nothing about unauthorized immigration whatsoever. <u>Hammon Doesn't Know Difference Between 'Hispanic' and Illegal Immigrant</u> (June 23, 2011), <u>in</u> (Doc. No. 14-3, at 117); <u>see</u> Jeremy Gray, <u>Alabama Hispanic Population growth 2nd Highest in the U.S.</u>, The Birmingham News (Mar. 26, 2011) (article that Hammon sent journalist).

Similarly, Representative Kerry Rich's opening statement to the legislature demonstrates the numerous ways in which legislators frequently conflated illegal immigration and Hispanics when discussing the ills to be remedied by HB 56. Representative Rich began his testimony as follows:

> "Representative Hammon, I want to thank you for bringing this bill to address an issue that is a huge issue in the State

of Alabama.  But it is especially a huge
issue on Sand Mountain.  I want to say
to my colleagues here in the House that
I realize, and I realize completely,
that God loves Hispanics just as much as
he loves me, anybody in this chamber,
and I understand that.  I don't question
that one second.

"But I tell you what I do have a problem
with.  First of all, if Hispanics come
to this country and they come to this
country legally, and there is about 20
percent of them that we are told, in our
area, that have come here legally, I
have no problem with them whatsoever.
As a matter of fact, I like the Hispanic
people.  Most of the Hispanic people are
hard workers.  Most of them have good
family values.  Most of them are good
Christian, church-going people.  The
ones that I have a problem with are the
ones that come here and create all kinds
of social and economic problems.  And
those problems are rampant in our area.

"The population of Marshall County
increased by about 11 thousand in this
last census from 2000 to 2010.  And
according to estimates from the Census
Bureau, there is about 11 thousand
Hispanics in Marshall County now.  And
there is even more in other parts of
Sand Mountain.  I will give you two
quick examples. 95 percent of the
children that are in the elementary
school at Crosswell Elementary School
are Hispanic, 95 percent of them.  52
percent of the children that attend

Albertville Elementary and Primary
School are Hispanic, and the biggest
part of them are illegal.

"It is costing our area hundreds of
thousands, if not millions, of dollars
to educate these children.  And the
taxpayers in my area -- they don't
deserve to have to pay that bill.

"They don't deserve that.

"Let me give you just one example.  And
I want to make this clear as to what
happens in our area. Illegals come to
our area, and they have children just as
soon as they can.  Now, this is real[ly]
what I am talking about.  They have
children just as soon as they can. And
then when they start them into school,
they go and register them and most of
the time they register their children,
if they were born here, they register
them in their real name.  But then--and
they--and the parents give the school
their real name. But what happens is
they tell them that if you call my
workplace, wherever that is, poultry
plant, whatever, if you call my
workplace, then don't ask for me under
this name, ask for me under this other
name."

Leg. Session (Doc. No. 14-3, at 33-34) (emphasis added).

Rich memorialized similar comments on the website related

to his position as a representative.  Hearing Tr. (Doc. No. 68, at 57).

As with Hammon, the county population figures Rich relies on are for Hispanics, not non-citizens or illegal immigrants.  Moreover, his criticism (that "The ones that I have a problem with are the ones that come here and create all kinds of social and economic problems") appears to be aimed at Hispanics in general, not illegal immigrants.

Furthermore, there is evidence that the legislative debate on HB 56 was laced with derogatory comments about Hispanics.  This evidence reinforces the contention that term illegal immigrants (the purported target of HB 56) was just a racially discriminatory code for Hispanics. For example, Representative Rogers made comments that reflect popular stereotypes about Mexicans and draw explicit distinctions along the lines of race and national origin, not immigration.  Rogers argued that HB 56 needed to punish employers that hired undocumented workers more harshly.  In so doing, he explained "I am

not against deterring illegals," and then described the
sorts of "illegals" that needed deterring by anecdote:
"Now, they have got some up here in Hoover and
Homewood--that I saw them about 30 of them get out of a
car one day.  I see guys--I thought it was a circus.
They kept getting out and kept getting out. ... [B]ut the
kidding part about it now is if we stop the employer from
employing them, they won't come.  Now, that is why I
would like to see a ... law that ... punishes employers."
Leg. Session (Doc. No. 14-3, at 78).  Rogers then
continued:

> "I have gotten calls from--from
> Hispanics.  But the killing part about
> them, I will tell you what happened.  I
> know for a fact you won't believe this.
> But when they get a chance to become
> legal, you know [w]hat they put on his
> ... driver's license?  White.  They put
> white down there.  I--I don't know about
> 20 of them right now. The are darker
> than I am.  But it say white on it--on
> their driver's license."

(Id. at 78-79).  In this statement there is a stereotype
commonly associated with Mexicans (they ride in crowded
cars), and this stereotype overlaps with assumptions

frequently made about unlawful immigrants. See, e.g.,
United States v. Garcia, 732 F.2d 1221, 1228-29 (5th Cir.
1984) (Tate, J., dissenting) (arguing that '"reasonable
suspicion' of illegal alien entry cannot be based upon
the mere circumstance that a crowded pickup truck of
dirty appearing Hispanic-descended workmen is traveling
on an Interstate highway at 11:30 in the evening"");
United States v. Mallides, 473 F.2d 859, 860 (9th Cir.
1973) (describing police officers assumption that a car
contained "illegal aliens ... based entirely on the
officers fleeting observation that there were six
Mexican-appearing men in the car").

Along these same lines, Representative Thomas E.
Jackson commented that getting rid of "illegal"
immigrants might be counterproductive because "immigrants
do keep this nation functioning," by he meant: "the
people I saw when I went to visit the chicken houses"
were "4-foot Mexicans in there catching them chickens."
Leg. Session (Doc. No. 14-3, at 32).

The contention, based on the above examples from what
is in the record, that the term illegal immigrants was
often a code for Hispanics is reinforced by the fact
that, as shown above, HB 56 treats mixed status children,
the overwhelming number of which are Latino, differently
from the way children have been historically viewed and
treated in Alabama.[21]

---

21.  To be sure, many other examples in the record
provide support for the inference that Latinos were the
target of HB 56.  For instance, there are many statements
that focus on Sand Mountain, Albertville, and Marshall
County, Alabama, which, at 12% of the county's
population, has an over-concentration of Latinos relative
to the state population of 3.7%.  Marshall County U.S.
Census Bureau Quick Facts(Doc. No. 14-3, at 124); see,
e.g., Hearing Tr. (Doc. No. 68, at 77) (Senator Scofield
describing Marshall County as the "epicenter" of illegal
immigration in Alabama); Leg. Session (Doc. No. 14-3, at
68, 77) (Representative Hammon explaining that "illegals
... work all over North Alabama," and describing
"situations" in Marshall County that have "crimes that
are very much akin to slavery"); Sam Rolley, Beason: Dems
Don't Want to Solve Illegal Immigration Problem, The
Cullman Times (Feb. 6, 2011) (Doc. No. 14-3, at 9)
(quoting Senator Beason saying that the "reality is that
if you allow illegal immigration to continue in your area
you will destroy yourself eventually. . . . If you don't
believe illegal immigration will destroy a community go
and check out parts of Alabama around Arab and
Albertvile").  Likewise, Representative Rich noted
(continued...)

In conclusion, while the court cannot yet say conclusively, based on the <u>Arlington Heights</u> factors, that discriminatory bias against Hispanics was behind HB 56, the current evidence of such in the record is substantial enough to support putting HB 56 on hold

_____

21.(...continued)
"estimates by a large number of people that roughly 80% of these people in the area are illegal," and, to be sure, Rich was "talking about people that are Hispanic that are in our area that are illegal." Leg. Session (<u>Id</u>. at 8).

As mentioned, referring to Latinos may in some ways be inevitable when discussing the issue of immigration in Alabama. However, as the discussion of preemption made clear, there is simply no way to "tell" simply by looking at an individual what their immigration status is, and the evidence of how these legislators know, or purport to know, that the Latinos in Marshall county are unlawfully present is little more than speculation and hearsay from people around town. Nonetheless, when confronted with a similar absence of evidence, many of the same legislators presumed that other groups of immigrants were "legal." <u>See, e.g.</u>, Hearing Tr. (Doc. No. 68, 91-92) (Scofield describing presumably legal groups); Rich Tr. (Doc. No. 51-5, at 13-14) (same). Thus, the combination of a lack of evidence and an assumption of unlawfulness applied to Latinos that is not applied to other groups, especially when buttressed against evidence of the conflation of Latino and "illegal immigrant," supports an inference of discrimination.

pending further discovery and final presentation of evidence by the parties on the issue.

### b. Disparate Impact

As noted, housing practices that have a discriminatory effect on individuals of a certain race or national origin can violate the FHA.  To prevail on a disparate-impact claim, the plaintiffs must first make a prima-facie showing of discriminatory effect.  That may be accomplished by showing either "that the decision has a segregative effect" or that "'it makes housing options significantly more restrictive for members of a protected group than for persons outside that group.'"  Bonasera v. City of Norcross, 342 F. App'x 581, 586 (11th Cir. 2009) (quoting Hous. Investors, Inc. v. City of Clanton, Ala., 68 F. Supp. 2d 1287, 1298 (M.D. Ala. 1999) (Thompson, J.)).  The plaintiffs here have taken the latter course, arguing that the Alabama's implementation of § 30 significantly restricts housing options for Latinos in Alabama.

While there is no single test for measuring whether a protected class bears the brunt of a facially neutral housing policy, "certain guidelines have developed," Hallmark Developers, Inc. v. Fulton County, 466 F.3d 1276, 1286 (11th Cir. 2006):

> "First, it may be inappropriate to rely on absolute numbers rather than on proportional statistics.   Second, statistics based on the general population [should] bear a proven relationship to the actual [population at issue].   Third, the appropriate inquiry is into the impact on the total group to which a policy or decision applies."

Id. (internal quotes and citations omitted).   Whatever the analysis, if plaintiffs' statistics demonstrate that Latinos are disproportionately affected by the State's actions, then they have established a prima-facie case of disparate impact.

But, "[o]f course, not every housing practice that has a disparate impact is illegal." Graoch Assoc. #33, L.P. v. Louisville/Jefferson County Metro. Hum. Relations Comm'n, 508 F.3d 366, 375 (6th Cir. 2007); cf. Metro.

90

Hous. Dev. Corp. v. Village of Arlington Heights, 558
F.2d 1283, 1290 (7th Cir. 1977) ("Although we agree that
a showing of discriminatory intent is not required under
section 3604(a), we refuse to conclude that every action
which produces discriminatory effects is illegal.").
More than a prima-facie case of disparate impact is
necessary before the plaintiffs can prevail.  However,
the next step in the inquiry is unclear.  See Graoch, 508
F.3d at 372-74 (explaining sources of agreement and
disagreement between circuits); Ojo v. Farmers Grp., 600
F.3d 1201, 1204 n.2 (9th Cir. 2010) (per curiam) (noting
the different approaches taken by courts within the Ninth
Circuit).  There are two possible paths: courts either
apply a burden-shifting approach similar to that used in
workplace-discrimination cases under Title VII of the
Civil Act of 1964, as amended, 42 U.S.C. §§ 1981a, 2000e
through 2000e-17, or a balancing test designed to uncover
the appropriateness of the defendants' behavior.

The case law in the Eleventh Circuit, which
frequently relies upon City of Chickasaw, points towards

91

the latter approach.  <u>See, e.g.</u>, <u>Bonasera</u>, 342 F. App'x at 585;  <u>Reese v. Miami-Dade county</u>, 242 F. Supp. 2d 1292, 1304 (S.D. Fla. 2002) (Highsmith, J.).

In <u>City of Chickasaw</u> the court examined a residency requirement that the plaintiffs insisted had a disparate impact on African-Americans.  504 F. Supp. at 730.  Since not all actions with a discriminatory effect on housing are illegal, the court considered "four factors which can ... test whether the conduct that produces a discriminatory impact ... violates the [FHA]": (1) the magnitude of the discriminatory effect, (2) whether there is any evidence of discriminatory intent, (3) the defendant's interest in taking the complained-of action, and (4) whether the plaintiffs sought to compel the defendant affirmatively to provide housing for members of a protected class or merely "restrain the defendant from interfering with individual property owners who wish to provide such housing."  <u>Id</u>.  That approach, originally conceived by the Seventh Circuit, <u>Metro. Hous. Dev. Corp. v. Arlington Heights</u>, 558 F.2d 1283, 1290 (7th Cir.

**92**

1977), has been followed, with some modification, in the Fourth Circuit, <u>Smith v. Town of Clarkton, N.C.</u>, 682 F.2d 1055, 1065 (4th Cir. 1982), the Sixth Circuit, <u>Arthur v. City of Toledo, Ohio</u>, 782 F.2d 565, 575 (6th Cir. 1986) (adopting factors one, three, and four), and the Tenth Circuit, <u>Mountain Side Mobile Estates P'ship v. Sec. of Hous. & Urban Dev.</u>, 56 F.3d 1243, 1252 (10th Cir. 1995) (rejecting the second factor), among others.

As an initial matter, the plaintiffs have clearly established a prima-facie case of disparate impact against Latinos. The "starting point" of this court's analysis "is always the subset of the population that is affected by the disputed decision," which, in this case, is owners of manufactured homes (and their children) who, but for this law, would pay their registration fee and renew their identification decal. <u>City of Clanton</u>, 68 F. Supp. 2d at 1299.

At the most general level, and as Commissioner Magee admits, the subset of the population most directly affected by HB 56 is non-citizens. <u>See</u> Magee. Br. 17

93

(Doc. No. 38).  In Alabama, that group is overwhelmingly and disproportionately Latino.  While Latinos make up only 3.7% of the State's population, they constitute 64.8% of non-citizens residing in Alabama.  Crook Decl. (Doc. No. 14-2, at 7, 11).  Moreover, while only 13.5% of Alabamians live in mobile homes, roughly 27.6% of Latinos do so (compared to 14.6% of whites, 10.2% of Blacks, and 3.2% of Asians).  Id. at 2, 15.  Put another way, while Latinos make up only about 3.7% of the State's population, they constitute nearly 7% of those living in mobile homes.  Since Latinos are more likely to reside in mobile homes than are other racial groups, they will bear a disproportionate burden from any regulation targeting mobile home residents.  Section 30's application to Alabama's manufactured homes statute therefore targets two groups that are disproportionately Latino: non-citizens residing in Alabama and residents of mobile homes.  Doing so creates a severe and disproportionate effect on Alabama's Latino population.

94

The defendants do not challenge that conclusion. Instead, Magee responds with the cursory allegation that those statistics are "misleading" because "100% of illegal immigrants are not U.S. citizens" and that, "Therefore, one could always prove, statistically, that a law [targeting] illegal immigrants has an adverse impact based upon persons of foreign birth." Magee. Br. 17 (Doc. No. 38).

Assuming this argument applies to Latinos as well as "persons of foreign birth," id., extending protection from housing discrimination to Latinos even when they are not specifically targeted by the challenged practice "is a feature of the FHA's programming, not a bug," Mt. Holly Gardens, 658 F.3d at 385. The entire purpose of the FHA is to root out discriminatory-housing practices, whether implemented with the intent to deprive certain groups of equal access to housing or not. While that broad scope makes it somewhat easier for a plaintiff to demonstrate a prima-facie case of discrimination, the Third Circuit has explained that: "We need not be concerned that this

approach is too expansive because the establishment of a prima facie case, by itself, is not enough to establish liability under the FHA.  It simply results in a more searching inquiry into the defendant's motivations-- precisely the sort of inquiry required to ensure that the government does not deprive people of housing 'because of race.'"  Id.

Moreover, the FHA protects "any person," regardless of his immigration status, and it is therefore no defense to an FHA claim to assert that those harmed by the State's actions are undocumented residents.  Plyler, 457 U.S. at 210.  Put another way, the cursory assertion that the State was primarily discriminating against some other, non-protected group (in this case non-citizens) does not undermine plaintiffs' showing of a prima-facie case of disparate impact against Latinos.  Cf. Griggs v. Duke Power Co., 401 U.S. 424 (1971) (holding that company's policy targeted the non-protected group of workers lacking a high school diploma could not save it from disparate impact claim after policy was shown to

have a disproportionate effect on African Americans). The court therefore easily concludes that the plaintiffs have likely made a prima-facie showing of disparate impact.

Since the statistics demonstrate that the State's actions in enforcing § 30 of HB 56 will have a disproportionate effect on Latinos in Alabama, the court next looks to the four factors laid out in City of Chickasaw to determine whether the plaintiffs are likely to succeed on the merits of their disparate-impact claim. Each of those factors favors the plaintiffs.

First, the complained of behavior has a dramatic disparate impact. Not only are the plaintiffs' statistics overwhelming, but after a full day of hearings and numerous rounds of evidentiary submissions there is no direct evidence that anyone other than Latinos has been or will be effected by § 30's application to Alabama's manufactured homes statute.

Second, as described more thoroughly above, the plaintiffs have provided substantial evidence of

97

discriminatory intent.  "[T]here can be little doubt that if evidence of [discriminatory] intent is presented, that evidence would weigh heavily on the plaintiff's side of the ultimate balance."  Town of Huntington, 844 F.2d at 936.  That plaintiffs have put forth such evidence therefore supports translating their prima-facie showing of disparate impact into an actual finding of illegal conduct.

Third, when assessing a claim for disparate impact, the court considers whether "the defendant is a governmental body acting outside the scope of its authority or abusing its power."  Arlington Heights, 558 F.2d at 1293.  If so, then the law "is not entitled to the deference which courts must pay to legitimate governmental action."  Id.  This is such a case.

Broadly speaking, regulation of immigration is the purview of the federal government, not the States.  By seeking to regulate immigration through HB 56, Alabama has exceeded its authority, which is why so many of HB 56's provisions are preempted.  In this case, the

specific provisions at issue deal with housing.  As emphasized above, housing is fundamentally distinct from other benefits, such as the provision of driver's licenses or access to employment, that States may, under some circumstances, condition on citizenship.  By focusing on housing, and thereby on the movement of Latinos into and out of the State, § 30 falls outside the authority vested in state legislatures.  Section 30 is therefore not entitled to the same deference as legislation falling within the traditional police powers of the State.  Without that deference, the State's actions are more likely to violate the FHA.

Fourth, and importantly, the plaintiffs are not asking for a hand-out, or the affirmative provision of housing.  Quite the opposite, all they want to do is lawfully pay their taxes.  Stated another way, the plaintiffs are seeking to remove a barrier to housing, not to force the State, affirmatively, to provide them additional assistance.  This weighs heavily in favor of finding illegal disparate impact.

In sum, a sufficient preliminary showing that all
four City of Chickasaw factors favor enjoining the
application of § 30 to § 40-12-255 on disparate-impact
grounds.  That showing, when backed up by plaintiffs'
evidence of a prima-facie case of disparate impact, is
enough for the court to find a likelihood of success on
the merits of their disparate-impact claim.[22]

_____

22. The same result would follow in those circuits
applying the burden-shifting approach mentioned above.
Under that approach, a prima-facie showing of disparate
impact shifts the burden to the defendant who must then
demonstrate that the law is related to a legitimate non-
discriminatory policy objective.  Doing so leads to an
inquiry into the existence of an alternative means to
accomplish that legitimate goal which would reduce or
eliminate the adverse impact.  See, e.g., Mt. Holly
Gardens Citizens v. Twp. of Mt. Holly, 658 F.3d 375, 381-
82 (3d Cir. 2011); Gallagher v. Oagner, 619 F.3d 823,
833-34 (8th Cir. 2010); Huntington Branch, NAACP v. Town
of Huntington Branch, 844 F.2d 926, 935-38 (2d Cir.
1988).

Here, Commissioner Magee argues that HB 56 was meant
to target illegal immigration, which she contends has
drained the State's resources and caused a host of other
problems.  There are two flaws with this reasoning.
First of all, as explained above, there is evidence that
the law was passed with discriminatory animus against
Latinos.  Second, even if the law was intended to protect
the state fisc by reducing the costs of education,
(continued...)

## C. Other Equitable Factors

That the plaintiffs are likely to succeed on the merits of both their preemption and FHA claims does not, in and of itself, justify injunctive relief.  To obtain a preliminary injunction, the plaintiffs must also show (1) irreparable harm, (2) that the balance of hardships

---

22.(...continued)
preventing the individual plaintiffs from paying what amounts to a tax is a strange way of accomplishing that goal, especially because Alabama schools are funded heavily by property taxes, not income taxes.  Opinion of the Justices, 624 So.2d at 114.  This disconnect calls into question whether the asserted justification for the manner in which the State is implementing § 30 is a bona-fide one.  See Town of Huntington, 844 F.2d at 936.

Moreover, even assuming a legitimate, non-discriminatory policy objective, there are certainly less discriminatory alternatives.  The proposed implementation of § 30 will have a dramatic effect on both Latinos who are United States citizens and those who are not, since all children born in this county are United States citizens and many of them live in manufactured homes with their non-citizen parents.  The State has done nothing to protect the interests of those citizens, thereby broadening the discriminatory impact that this legislation has on Latinos.  The State has therefore not selected the least discriminatory means of accomplishing its stated goal.

favors granting the injunction, and (3) that issuance of the injunction would not be adverse to the public interest.

The irreparable-harm factor clearly favors granting the requested injunction.    In <u>Gresham v. Windrush Partners</u>, the Eleventh Circuit held that "proof of the existence of discriminatory housing practices is sufficient to permit a court to presume irreparable injury."   730 F.2d 1417, 1424 (11th Cir. 1984).   The court provided several reasons why housing discrimination is sufficiently linked to irreparable injury so as to support such a presumption, many of which clearly apply to this case.    "First, a person who is discriminated against in the search for housing cannot remain in limbo while a court resolves the matter.   He or she must find housing elsewhere, and once that housing is found ... it becomes difficult to disrupt new friendships and other community ties by uprooting oneself again."   <u>Id</u>.   In this case, those affected by Alabama's implementation of § 30 will be forced not just out of their neighborhoods, but

precluded from owning a manufactured home that rests on rented land anywhere in Alabama, and will therefore likely leave the State. That will further exacerbate the disruption to friendships and communities. Moreover, attempts to find new housing will be complicated by the near complete ban on residency in manufactured homes.

Second, "monetary relief cannot correct the injury completely." Id. That is because the loss of housing also causes a number of other harms, including the loss of accessible jobs and "being unable to escape the never-ending and seemingly unbreakable cycle of poverty." Id. (internal quotation marks omitted). It is difficult to see how the individual plaintiffs (and those similarly situated) would be able to recover socially or financially from being forced from their homes, and certainly no relief that this court could grant would be able to compensate them fully for that loss. A presumption of irreparable harm may therefore be applicable in this case, especially since the defendants have nothing to rebut that presumption. But, given that

the extent of residential intrusion at issue here not only causes social disruption but goes directly to ownership, the court finds that irreparable harm is likely to result, regardless of any presumption, absent the entry of an injunction.

There is a second, independent reason for finding a likelihood of irreparable harm.  Those effected by the State's implementation of § 30 have two choices: abandon their homes or face civil fines and potential jail time. Putting individuals to such a choice causes irreparable injury.  In Morales v. Trans World Airlines, Inc., 504 U.S. 374, 381 (1992), the Court explained that forcing an individual to choose between violating a law or suffering the severe economic consequences of obeying it is a "Hobson's choice" that constitutes irreparable harm. While that case dealt with a potentially costly regulation, the same principle applies here: irreparable harm exists where the plaintiffs will suffer life-altering and potentially permanent damages that could not be sufficiently remedied at the conclusion of the

litigation even if the court ultimately finds in their favor. In this case, the individual plaintiffs will face a dilemma of either abandoning their homes or deciding to commit crimes, and this court lacks the remedial tools to undo the full effect and consequences of either choice.

The balance-of-Hardship factor also favors granting the requested injunction. Absent a preliminary injunction, the individual plaintiffs and those similarly situated must live in fear of being arrested and fined (for attempting to comply with their registration requirements or for remaining out of compliance) on the one hand or abandoning their homes on the other. Latinos, unable to live lawfully in their homes or to take their homes with them, will no doubt choose to uproot their children from school, quit their jobs, abandon their homes, pack up their belongings, and leave the State. Granting a preliminary injunction would prevent those harms and protect the status quo as this court determines the ultimate merits of the dispute.

Against that strong showing of hardship, the defendants have failed to even allege, let alone demonstrate, that any harm will befall them if an injunction is issued.  In fact, defendant Magee's decision to extend the time for obtaining or renewing manufactured home registrations suggests that any harm from not enforcing § 30 of HB 56 to Alabama Code § 40-12-255, should there be any at all, will be slight.  See Magee Order (Doc. No. 79-2).  On this basis, the balance of harms strongly favors the plaintiffs.

The public interest also favors granting the injunction.  As discussed above, the defendants appear to be implementing § 30 in a manner that violates the Supremacy Clause of the United States Constitution and the FHA.  There can be no doubt that the public benefits from uniform implementation of this nation's immigration laws, see Farmers Branch II, 701 F. Supp. 2d at 859, which can only occur if the defendants are enjoined.  Furthermore, as winter approaches, the public interest

supports ensuring individuals are secure in their homes pending resolution of this case.

With all four factors weighing heavily in favor of granting a preliminary injunction, the court easily concludes that one is necessary in this case. This injunction applies to all subparts of § 30, which means that the State may not request any information related to citizenship or lawful immigration status from those seeking to register their manufactured home or obtain an identification decal, nor can the State enforce § 30(d), which makes it a felony to enter into such a transaction, against those seeking to register their homes or obtain an identification decal.


## III. CONCLUSION

The plaintiffs are substantially likely to prevail on their claim that, applied to § 40-12-255, § 30 of HB 56 is preempted both as a regulation of immigration and because it conflicts with federal law. The plaintiffs are also substantially likely to prevail on their claims

107

under the FHA.  With all three equitable considerations

pointing squarely towards issuing a preliminary

injunction, the court concludes that one is appropriate

in this case.

An appropriate order will be entered.

DONE, this the 12th day of December, 2011.


    /s/ Myron H. Thompson    
UNITED STATES DISTRICT JUDGE